**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Hugh REED, Jay D. Hatton, Kerry M. Martin, Thomas C. Lawson, and Charles M. Terrell, Defendants-Appellants.**

**Nos. 80–5041 to 80–5044, and 80–5072.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 18, 1980.

Decided April 29, 1981.

---

H. Louis Sirkin, Cincinnati, Ohio (Court-appointed) for defendant-appellant in No. 80–5041.

Martin S. Pinales, Cincinnati, Ohio (Court-appointed) for defendant-appellant in No. 80–5043.

Jack T. Schwarz, Dayton, Ohio, for defendant-appellant in No. 80–5042.

Henry E. Sheldon, II, Cincinnati, Ohio (Court-appointed) for defendant-appellant in No. 80–5072.

Robert Good (Court-appointed), J. Murphy, Shelbyville, Ind., for defendant-appellant in No. 80–5044.

James C. Cissell, U. S. Atty., Bernard J. Gilday, Cincinnati, Ohio, for plaintiff-appellee in all cases.

Before ENGEL, KEITH and MERRITT, Circuit Judges.

ENGEL, Circuit Judge.

Defendants Hugh L. Reed, Jay D. Hatton, Kerry M. Martin, Thomas C. Lawson, and Charles M. Terrell were charged jointly in a three count indictment with receiving and concealing stolen goods and wares having a value in excess of $5,000 and traveling through interstate commerce, in violation of 18 U.S.C. §§ 2315 and 2 (1976). Count 1 involved certain property stolen from Dr. Randolph and Ruth Anderson and transported from West Virginia to Ohio. Count 1 involved property stolen from Carl and Helen Helman in Kentucky and transported to Ohio. Count 3 involved property stolen from Lloyd and Doris Rosenbaum and Fred Bose in Indiana and transported to Ohio.

Martin and Reed were charged in all three counts; Lawson and Terrell were charged in counts 1 and 2; and Hatton was charged in count 3 only. Jury trial commenced on December 3, 1979, and on December 14, after approximately one day of deliberations, the jury returned a verdict of guilty against all defendants on all charges. Thereafter the trial court imposed the maximum sentence of 10 years imprisonment and $10,000 fine on each defendant for each count. The trial judge ordered the sentences to run consecutively. All defendants appeal.

While no criminal conspiracy count was included in the indictment, the government's prosecution of the substantive offenses proceeded on the theory that the defendants were participants in a burglary and fencing operation which centered in Middletown, Ohio. The operation was bro-

ken when a convicted Middletown burglar, one Robert Miller, agreed to cooperate with federal authorities in exchange for possible lenient treatment on a number of outstanding charges against him. FBI special agent Richard Dorton, using the name Dick Dalton and posing as a Floridian dealer in stolen property, was brought in as an undercover agent to work with Miller and infiltrate the Middletown burglary and fencing ring.

The proof showed that in October 1978, Miller met with defendant Reed at the Office II Bar in Middletown and at that time Miller agreed to buy sterling silver from Reed at $55 per pound. Four days later, defendant Martin telephoned Miller informing him that he had some merchandise for sale. The next day Miller again met with Reed who described the silver and jewelry that Martin had procured and wished to sell. On that same day Miller went to defendant Lawson's home and there met with Lawson, Martin and Terrell. Silverware and jewelry were exhibited. Miller tested, weighed, sorted and eventually purchased the silver; however, the jewelry was not purchased. The silver alone constitutes the property forming the basis for count 1.

On October 31, 1978, Miller met Martin at Lawson's residence where the jewelry which had been exhibited earlier was inventoried and given to Miller who was to show it to Dorton. The defendants all knew and apparently trusted Miller but were less certain about Dorton. When Miller delivered the jewelry to Dorton, he photographed it and gave it back to Miller who, in turn, returned the jewelry to Martin.

On November 20, 1978, Miller and Dorton traveled to Terrell's residence where Martin produced a bag containing twenty-six jewelry pieces, all of which had been seen and photographed by Dorton on October 31. Four other pieces also previously seen and photographed by Dorton were later revealed. An agreement to sell the twenty-six pieces was concluded and Dorton made a $2,000 down payment. The next day Dorton met with Martin and Lawson and paid an additional $6,500, receiving the four ad-

ditional pieces of jewelry in return. These thirty pieces of jewelry constitute the stolen property described in count 2 of the indictment.

On December 11, 1978, Dorton and Miller met Reed and defendant Hatton to discuss another transaction. The following day Dorton met Hatton and Martin at Miller's home and there purchased an additional lot of jewelry and silverware. This property, as well as some ceramic "Toby" mugs which Hatton revealed at that time, constitute the property described in count 3 of the indictment.

Two principal issues are presented on appeal: (1) whether the offenses described in counts 1 and 2 were in fact one offense for which only one sentence ought to have been imposed, rather than the consecutive sentences handed down, and (2) whether the defendants were prejudiced by certain prior "bad act" evidence brought to the attention of the jury.

I

The first question raises the issue of what Congress intended to be the "appropriate unit of prosecution" for violations of 18 U.S.C. § 2315. In its brief, the government relies upon *Gore v. United States,* 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), and argues that since different evidence supports and proves each count, separate offenses properly were charged. Specifically, during oral argument the government referred to *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), and argued that the stolen property forming the basis for counts 1 and 2 was obtained from separate burglaries; therefore, the court could presume that the property was received at different times, thereby constituting separate violations of the statute. Moreover, the government contends that although both the jewelry and silverware were concealed and then re-

vealed to Miller on October 30th, the jewelry was reconcealed and again revealed on October 31st and November 30th. Finally, at oral argument, the government suggested that the source of the stolen property provides the appropriate unit of prosecution under 18 U.S.C. § 2315; therefore, proof of different sources (*i. e.* separate burglaries) would justify separate counts.

We think it rather clear that *Gore* involved a different question: whether the Double Jeopardy Clause precludes separate convictions under two separate statutes for the same criminal act. We are not concerned with such a situation here, but rather with the narrower question of what operative facts Congress intended to form the basis for a separate and distinct violation of 18 U.S.C. § 2315.

We also observe at the outset, as did Judge Weick in *United States v. Jones,* 533 F.2d 1387 (6th Cir. 1976), *cert. denied,* 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977), that *Blockburger's* "same facts test" does not apply to multiple counts under a single statutory provision where the offense involves a course of criminal conduct. Thus in *United States v. Woods,* 568 F.2d 509 (6th Cir.), *cert. denied,* 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978), we observed:

Here we are not concerned with whether a single act violates a multiplicity of statutes as in *Gore* and *Blockburger.* Rather, we face what the Supreme Court has recognized to be a different issue: whether a course of conduct—here, possession [of narcotics] with intent to distribute—can result in multiple violations of the same statute.... Our court has held that the "same facts" test in *Blockburger* is inapplicable to offenses charging a course of conduct, at least where Congress has not indicated the appropriate unit of prosecution.

*Woods, supra,* 568 F.2d at 514 n. 1 (citations omitted).[1]

---

1. The government's brief also cites to *Hackett v. United States,* 348 F.2d 883 (6th Cir. 1965), *cert. denied,* 382 U.S. 1029, 86 S.Ct. 651, 15 L.Ed.2d 541 (1966), and *United States v. Noel,* 490 F.2d 89 (6th Cir. 1974). In *Hackett,* the

defendant was convicted on four counts of unlawful possession and sale of heroin, the transactions occurring on two separate dates. The possession and sale of the heroin on each date formed the basis for two separate counts, one

681

■ Considering how long 18 U.S.C. § 2315 has been on the books, we are surprised to uncover no published decisions applying the merger doctrine to this Act. A careful examination of Supreme Court decisions, the legislative history of the statute, and decisions of our circuit in other similar cases, however, persuades us that upon the allegations set forth in counts 1 and 2 and the proofs adduced in support thereof, the two offenses should be merged and only one sentence ought to have been imposed against each defendant convicted on counts 1 and 2.

In *Bell v. United States*, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955), the Supreme Court reversed a decision of our circuit and held that an individual transporting two women across state lines for immoral purposes could be found guilty of only one single act of transportation in violation of the Mann Act. In so ruling, the Court examined the statutory language in its entirety, and articulated the following rule of statutory construction which guides us here:

> When Congress has the will it has no difficulty in expressing it—when it has the will, that is, of defining what it desires to make the unit of prosecution and, more particularly, to make each stick in a faggot a single criminal unit. When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.... It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.... *[I]f Congress does not fix the punishment for a criminal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses....*

*Bell, supra*, 349 U.S. at 83–84, 75 S.Ct. at 622. (emphasis added).[2]

for possession and the other for sale. On appeal the defendant argued that counts 1 and 2 for possession and sale on a particular date should have been merged, as should counts 3 and 4 pertaining to the possession and sale of heroin at the later date. Our court upheld the convictions and the separate counts finding that possession and sale of heroin were separate offenses under separate sections of the federal narcotics laws. *Hackett* is distinguishable from the present appeal inasmuch as two statutes were involved (as in *Gore*), whereas here only one statute is alleged to have been violated. Somewhat closer is the per curiam opinion of our court in *Noel*. There the defendant was charged with two counts of aiding and abetting in the sale of 104 grams of a substance containing heroin and another count of aiding and abetting in the sale of .76 grams of a substance containing heroin, both on the same day and through the same agent. Our court in that case, however, distinguished the two counts on the basis that the proof showed that the two "spoons" of heroin were obtained for two separate individuals, although the sale of each was made on the same day and through the same agent. Whatever may be the precedential value of this opinion, it is worth noting in any event the court specifically took notice of the fact that the sentences on all three counts were designated to run concurrently.

**2.** Again in *Ladner v. United States*, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958), the defendant was charged in two separate counts of an indictment with violation of 18 U.S.C.

§ 254 prohibiting assault on a federal officer in the performance of his duty. Proofs there showed that the defendant had discharged a shotgun into the front seat of an automobile thereby wounding two federal officers. This posed the question whether Congress meant that a single discharge of a shotgun would constitute one assault and thus only one offense regardless of the number of officers who had been injured, or whether Congress intended to define a separate offense for each federal officer affected by the shotgun blast. Relying upon *Bell* and upon *United States v. Universal CIT Credit Corporation*, 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952), the Supreme Court held that a general judicial policy of lenity prohibits interpreting a federal criminal statute to increase the penalty "it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Ladner, supra*, 358 U.S. at 178, 79 S.Ct. at 214. After examining the statutory language and relevant legislative history, the Court stated:

> If Congress desires to create multiple offenses from a single act affecting more than one federal officer, Congress can make that meaning clear. We thus hold that the single discharge of a shotgun alleged by the petitioner in this case would constitute only a single violation of § 254.

*Id. See also United States v. Woods*, 568 F.2d 509 (6th Cir.), *cert. denied*, 435 U.S. 972, 98 S.Ct. 1614, 56 L.Ed.2d 64 (1978), where the defendant had been found guilty on four sepa-

Thus, we first turn to the language and legislative history of 18 U.S.C. § 2315. This provision of the criminal code provides:

Whoever receives, conceals, stores, barters, sells, or disposes of any goods, wares, or merchandise, securities, or money of the value of $5,000 or more, or pledges or accepts as security for a loan any goods, wares, or merchandise, or securities, of the value of $500 or more, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been stolen, unlawfully converted, or taken; or

Whoever receives, conceals, stores, barters, sells, or disposes of any falsely made, forged, altered, or counterfeited securities or tax stamps, or pledges or accepts as security for a loan any falsely made, forged, altered, or counterfeited securities or tax stamps, moving as, or which are a part of, or which constitute interstate or foreign commerce, knowing the same to have been so falsely made, forged, altered, or counterfeited; or

Whoever receives in interstate or foreign commerce, or conceals, stores, barters, sells, or disposes of, any tool, implement, or thing used or intended to be used in falsely making, forging, altering, or counterfeiting any security or tax stamp, or any part thereof, moving as, or which is a part of, or which constitutes interstate or foreign commerce, knowing that the same is fitted to be used, or has been used, in falsely making, forging, altering, or counterfeiting any security or tax stamp, or any part thereof—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

There is scant legislative history on 18 U.S.C. § 2315. The forerunner of this pro-vision is § 4 of the National Motor Vehicle Theft Act, ch. 89, 41 Stat. 324, enacted October 29, 1919 (hereinafter "NMVTA"). This statute, now embodied as amended in 18 U.S.C. § 2311, et seq. (1976), originally provided in Sections 3 and 4 thereof:

That whoever shall transport or cause to be transported in interstate or foreign commerce a motor vehicle, knowing the same to have been stolen, shall be punished by a fine of not more than $5,000, or by imprisonment of not more than five years, or both.

That whoever shall receive, conceal, store, barter, or dispose of any motor vehicle ... knowing the same to be stolen, shall be punished by a fine of not more than $5,000, or by imprisonment of not more than five years, or both.

House Report No. 66–312, dated September 12, 1919, and accompanying H.R. 9203 (which was later enacted as the NMVTA), was relatively brief. It discussed the magnitude of the stolen vehicle problem, the impact of this problem on insurance rates and availability, and noted that stolen vehicles were transported in interstate commerce in order to facilitate their subsequent sale. The report evidences considerable concern with the constitutionality of the Act, referring specifically to the Supreme Court's decision in the *Lottery Case*, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903). There, by a 5–4 majority, the Court upheld the authority of the Congress under the Commerce Clause to regulate interstate traffic in lottery tickets. House Report No. 66–312, on page 4, stated:

The purpose of the proposed law is to suppress crime in interstate commerce.... No good reason exists why Congress, invested with the power to regulate commerce among the several

---

rate counts of an indictment charging violations of the narcotics laws. On appeal, our court merged counts 1 and 2 which essentially charged Woods with possession of specific but different amounts of the same drug at the same time. Examining the legislative history of the narcotics laws in issue, we observed:

However, as long as the statute does not graduate the gravity of the crime of posses-

sion of heroin by the quantity possessed, we see no indication that Congress intended to permit a multiplication of the offenses of possession at any given time by a defendant upon evidence that the heroin may merely have been separately packaged or stashed. *Id.*, at 513.

States, should not provide that such commerce should not be polluted by the carrying of stolen property from one State to another. Congress is the only power competent to legislate upon this evil, and the purpose of this bill is to crush it, with the penalties attached.

The NMVTA, of course, applied only to stolen automobiles. After two earlier unsuccessful efforts to amend the statute, the Congress on May 22, 1934, enacted the National Stolen Property Act, ch. 333, 48 Stat. 794 (the "NSPA"), which amended the NMVTA by extending its coverage to all types of stolen property and securities. A further amendment on August 3, 1939, ch. 413, 53 Stat. 1178, extending coverage to forged securities, was accompanied by House Report No. 76–422, dated April 18, 1939. That report merely observed that the purpose of Section 4 of the NSPA (codified as 18 U.S.C. § 2315 with which we are concerned on this appeal) was to deter the receipt of stolen property transported in interstate commerce. None of the legislative history specifically reflects any precise congressional concern with determining what the appropriate unit of prosecution should be in such cases other than that its total value must of course exceed $5,000. Based upon the paucity of guidance from the legislative history, *Bell* would dictate that the statute be construed in favor of lenity.

As we noted at the outset, we have found no cases that have examined 18 U.S.C. § 2315 with a view to resolving the issue before our court today. However, we note that in 1961 the Supreme Court vacated per curiam the Fifth Circuit's decision in *Castle v. United States*, 287 F.2d 657 (5th Cir. 1961). *See Castle v. United States*, 368 U.S. 13, 82 S.Ct. 123, 7 L.Ed.2d 75 (1961). There the petitioner was convicted on five separate counts of violating 18 U.S.C. § 2314, which prohibits the interstate transportation of forged or altered securities. Petitioner had transported five forged money orders across state lines, but all at the same time. Relying upon *Bell* and the rule of lenity for construing ambiguous statutes, the Court found that petitioner could be

convicted of only one offense even though he had transported five separate forged securities. It is of some note that 18 U.S.C. § 2314 is very similar to 18 U.S.C. § 2315, the provision under review today. In fact, both provisions are based upon the same original legislation—the NMVTA.

We believe that recent decisions in our circuit support our decision to merge counts 1 and 2. In *United States v. Jones, supra*, the defendant was convicted on three counts of a five count indictment charging him with possession of a firearm as a convicted felon in violation of 18 U.S.C. App. § 1202(a) (1976). The three counts of the indictment involved the same firearm, but entailed three different occasions when the police observed the weapon in the defendant's possession. On appeal, Jones contended that the multiple convictions violated the Double Jeopardy Clause of the Fifth Amendment since only one offense had been committed under the statute. Writing for the majority, Judge Weick relied upon *Crepps v. Durden*, Cowper 640 (K.B.1777), for the proposition that a series of acts constituting a course of conduct are not punishable separately if the legislature intended to punish the course of conduct alone:

> Possession is a course of conduct, not an act; by prohibiting possession Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in a firearm. If Congress had wished to punish each act of dominion it could have done so easily by forbidding the acts of dominion instead of the course of conduct.

*Jones, supra*, 533 F.2d at 1391. Judge Weick then relied upon *Bell*, as authority for construing an ambiguous statute in favor of lenity.

Again, in *United States v. Rosenbarger*, 536 F.2d 715 (6th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977), the defendant was convicted in a three count indictment charging him with receiving and possessing firearms after hav-

ing been convicted of a felony, in violation of 18 U.S.C. App. § 1202(a)(1). During a single search of his home, the police discovered three weapons; his possession of each was the subject of a separate count. Once more our court held that under the circumstances only one offense was charged under Section 1202(a)(1), regardless of the number of firearms involved and absent a showing that the firearms were stored or acquired at different times or places. Relying upon *Bell*, the court found that 18 U.S.C. App. § 1202(a)(1) was ambiguous as to the appropriate unit of prosecution and therefore should be construed in favor of lenity. Noting that 18 U.S.C. App. § 1202(a)(1) refers to the possession of "any" firearm, Judge Weick observed "If Congress had desired to create a separate offense on the basis of each firearm possessed, this could have been easily written into the statute." *Id.*, at 721.[3] In like fashion, 18 U.S.C. § 2315 prohibits the receipt or concealment of "any" property having a value in excess of $5,000 and traveling in interstate commerce.

Somewhat akin to *Rosenbarger*, the government here claims that separate offenses are stated in counts 1 and 2 because the property forming the basis for those two counts was obtained from separate and distinct sources. The count 1 property was taken from the home of Dr. Ralph and Ruth Anderson in West Virginia while the count 2 property was taken from the home of Carl and Helen Helman in Kentucky. Since the merchandise was acquired from different sources at presumably different times, the government suggests that the defendants received the property at different times; therefore, no injustice exists in treating the two counts as entirely separate offenses.

Yet, the defendants were not in fact charged with theft of the property involved but rather its receipt and concealment on a given date. While it is true that there was evidence concerning the different dates the property was stolen it is not alleged that the defendants themselves actually stole or received the property on those dates. That this is true is made manifestly clear from the government's own brief:

> On October 30, 1978, (A.90–92) witness Miller viewed, examined, tested and agreed to purchase the Count I sterling silver which was stolen on October 21, 1978 in Charleston, West Virginia, (A.238–240). Miller also saw, at this time, the Count II jewelry (A.94) which was stolen on October 14, 1978 in Louisville, Kentucky, (A.242–246), and which was retained and reconcealed by Appellants. (A.95).

Brief for Appellee at 31. From the very recitation of facts, it appears that the evidence relates to the presence at the same time of the silver and jewelry which had been stolen earlier in West Virginia and in Kentucky. Given that the unlawful act alleged in each count was that the defendants "did receive and conceal" on the date in question, thereby implying a course of conduct, we believe that our prior decisions, especially *Rosenbarger*, support the merger of counts 1 and 2, especially since the statute itself is ambiguous as to the appropriate unit of prosecution. There is no indication that the course of the stolen property was to delineate the appropriate unit of prosecution. Regardless of where the property came from or how the defendants came to have it, the proofs tend to show a course of illegal conduct as to counts 1 and 2. Under such circumstances the ambiguity inherent in this statute requires the application of *Bell's* rule of lenity and a resulting merger of those counts.

## II

The defendants complain of several instances during the trial where their character was impugned and their way of life was subjected to ridicule. Specifically, the defendants claim the government's witnesses

---

3. Recent decisions in this and other circuits have cited *Rosenbarger* with approval. *See United States v. Hickman*, 592 F.2d 931 (6th Cir. 1979); *United States v. Killebrew*, 560 F.2d 729 (6th Cir. 1977); *United States v. Bullock*, 615 F.2d 1082 (5th Cir. 1980); *United States v. Causey*, 609 F.2d 777 (5th Cir. 1980); *United States v. Smith*, 591 F.2d 1105 (5th Cir. 1979); *United States v. Powers*, 572 F.2d 146 (8th Cir. 1978).

(in particular collaborator Miller and agent Dorton), prompted by improper questions, gave testimony concerning the defendants' past association with known thieves and their frequenting the Office II Bar, which was described for the jury as a "hangout for thieves." Moreover, there were numerous references to the "Middletown Gang," as well as the "HAMFAT Operation" which was described to the jury as an undercover operation aimed at thieves and fences.

The government seeks to justify these questions and this testimony on the basis of Fed.R.Evid. 404(b), which permits evidence of prior misconduct to be used in certain limited circumstances—namely, when an issue exists as to the defendant's intent, motive, guilty knowledge, common plan or scheme, absence of mistake or accident.[4]

The government also contends that a conviction under 18 U.S.C. § 2315 requires proof of specific intent; therefore, in order to carry its burden of proof, the government maintains it may introduce bad act evidence as part of its case in chief, whether or not the defendants actually place their character or intent in issue. The government relies primarily upon *United States v. Weidman*, 572 F.2d 1199 (7th Cir.), *cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978), for this proposition.

Although our decision in *United States v. Ring*, 513 F.2d 1001 (6th Cir. 1975), noted that receipt of stolen property (*i. e.* 18 U.S.C. § 2315) was a specific intent crime, that decision also held that bad act evidence must be substantially similar and near in time to the crimes being prosecuted before it can be admitted to show intent, motive, or some other specific exception under Rule 404(b). See *Ring, supra,* at 1005. *Accord, United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977); *United States v. Largent*, 545 F.2d 1039, 1043 (6th Cir. 1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977); *United States v. Mahar*, 519 F.2d 1272 (6th Cir.), *cert. denied*, 423 U.S. 1020, 96 S.Ct. 458, 46 L.Ed.2d 393 (1975).

The references to alleged past criminal associations were of a general nature; there was no testimony as to specific prior bad acts or their substantive or temporal relationship to the offense charged. Rule 404(b) and our prior decisions do not countenance the use of generalized bad act evidence for the purpose of impugning a defendant's character. As Judge Merritt noted in *United States v. Phillips*, 599 F.2d 134, 137 (6th Cir. 1979), "There was no justifiable evidentiary purpose served by general testimony . . ." about defendant's prior bad acts.

We observe at the outset that there was too much of this in this trial, and that while the trial judge made a diligent effort to exclude the evidence or to strike it when it slipped in, he did not altogether succeed. Thus, the Office II Bar in Middletown, Ohio, where much of the activity occurred, was described as a favorite haunt for felons and thieves, impliedly painting all patrons, including the defendants, with the same brush. And the most objectionable conduct came in the direct examination of the government informer, an experienced burglar who was trying to escape prosecution on a number of outstanding felony charges by cooperating with the federal authorities. The technique employed by the prosecutor was to question Miller concerning his knowledge of the occupation of each of the defendants, thereby eliciting the fact that each was a known burglar or fence. While objections to these questions were generally upheld and the jury was frequently cautioned to ignore the testimony, it would be idle to believe that the impression of the defendants' collective bad character was not placed before the jury. Furthermore, the prosecutor's subsequent effort to elicit whether Miller knew the defendants' occu-

---

**4.** Rule 404(b) reads:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

pations, without pursuing the matter further, appears a cunning ploy to get around the court's admonition by taking advantage of implications from the previously expunged testimony.

█ We believe the foregoing constituted misconduct, particularly where the prosecution persisted in this subtle method of impugning the defendants' characters. However, our role on appeal is to review the record as a whole and ascertain if this error so adversely affected the substantial rights of the defendants as to compel reversal, *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), Fed.R. Crim.Pro. 52, or even if not, whether the exercise of our supervisory powers requires, as a matter of sound judicial administration, the deterrent therapy of a new trial. Each consideration involves separate values; both demand informed appellate judgment.

█ By far the most important consideration is the impact of any error upon the right of the defendants to a fair trial. The admission of evidence of other wrongful acts, prior misconduct or bad reputation in these circumstances was fraught with great risk to the fairness of the trial. In this respect we agree with the Second Circuit's observation in *United States v. DeVaughn*, 601 F.2d 42, 45 (2d Cir. 1979), that " '[c]aution and judgment are called for, and a trial judge faced with another crimes problem should require the Government to explain why the evidence is relevant and necessary.' "

We have reviewed the entire transcript of the case because of the potential seriousness of the error. As frequently happens, such an examination tends to place the error in better perspective and to provide the reviewer with a more accurate evaluation of the actual impact of the error upon the outcome of the case. Such a review here leads us to conclude that the error was harmless.

We observe first that there is no clear-cut constitutional rule to be applied. Rather, courts historically have differed on this issue, interpreting and applying the federal rules of evidence to the peculiar facts of each appeal. Thus, Rules 403 and 404 very frequently call for the introduction of evidence far more damning than that here without any constitutional implications. And as we noted in *Czarnecki*, "the legislative history of [Rule 404(b)] suggests that there be greater emphasis on admissibility of [bad act] evidence." *Czarnecki, supra*, 552 F.2d at 702.

Most important, however, is the overwhelming strength of the government's case. If the evidence properly admitted at trial were otherwise equivocal it might be necessary to reverse. The evidence, however, was not equivocal; on the contrary, it was exceptionally conclusive. The defendants point to Miller's unreliability as a witness, claiming he had every reason to testify favorably for the government in order to save his own skin. Yet, his testimony was thoroughly corroborated by independent and trustworthy evidence in the form of agent Dorton's testimony, surveillance photographs and tape recordings of several incriminating conversations. Moreover, the government introduced the stolen property itself. This consisted of a virtual mountain of glittering jewelry and silverware. Some of the defendants sought to put themselves as far from the stolen goods as they could. However, the absence of any persuasive explanation for their presence and conduct when the stolen goods were displayed strongly demonstrated their involvement in the course of criminal conduct for which they were convicted. We are left with the unswerving conclusion that had the wrongful misconduct never occurred the result would have been the same, and therefore any error was harmless. *See United States v. Hurst*, 510 F.2d 1035 (6th Cir. 1975); *United States v. Ortiz*, 507 F.2d 1224 (6th Cir. 1974).

Even though we may find that the error was harmless and would not have affected the outcome of the trial, we must still consider whether the exercise of our supervisory responsibilities calls for reversal. Upon consideration, we conclude that it does not.

We observe first that such questions ought in the first instance to be left to the wise discretion of the trial judge. It is he who has an opportunity to observe at first hand the impact of the error and the nature of the conduct and the motivations behind it. While the trial judge might more carefully have required the government to explain fully the basis for the questioning, there appears to have been a colorable claim of right here. At least three defense counsel during opening argument apparently raised issues of their clients' intent and participation in the criminal activity.[5] While this does not open the door to generalized bad act evidence, under these circumstances the government may have had a good faith belief that the objectionable evidence was necessary and admissible.[6] Moreover, given the possibility of the government's good faith, we must consider the great expense to the court and the public of requiring a new trial. Finally, our review of the entire record indicates the constant fairness of the trial judge and the evenhandedness with which he presided over the trial. He frequently addressed the jury concerning the manner in which it was to receive and consider evidence. He did not hesitate to upbraid the prosecutor when he believed that the government had overstepped its bounds, or to criticize witnesses who, from excessive zeal, sought to volunteer more information and opinion than was required by a particular question. Our review convinces us that the trial judge preserved the essence of a fair trial.

### III

Several additional errors are asserted by the defendants, none of which, however, we find of sufficient merit to warrant extended discussion.

■ A great deal of argument both at trial and in the briefs went to the accuracy of tape recordings admitted into evidence, and of transcripts of these tapes that were given to the jury while in court but not admitted into evidence. The trial judge in all instances was particularly careful to caution the jury that the transcript employed was but a tool to assist them in listening to the tapes, and that in all events the tape recordings were the only relevant evidence which the jury was to consider and weigh. Again, the trial judge's decision to admit the tapes into evidence was not erroneous and the use of the transcripts, with the appropriate cautionary instructions, was not an abuse of discretion.

■ Certain of the defendants, and particularly Jay Hatton, claim they should have been accorded a separate trial since there was no charge of conspiracy and their

---

5. For example, during defense counsels' opening arguments, the following remarks were made to the jury:

I think what the evidence will show, the credible evidence, is that Mr. Hatton is being charged here because he was in the wrong place at the wrong time. I think the strongest case that the government is going to be able to present against Mr. Hatton is that he was at the wrong place at the wrong time. I believe they call that guilt by association, which certainly is not sufficient to sustain criminal conviction in our system.
*Trial Transcript* at 113.
The evidence of that transaction will show that Mitchell Terrell got nothing, did nothing and was merely at a house where this transaction took place. We don't dispute he was here. He was there, and we don't dispute that he knows these other individuals. The question is, was he involved in any way? That's the way we view the evidence on the first count on Micky Terrell.

*Trial Transcript* at 117. Other remarks by defense counsel for Messrs. Terrell, Reed, and Hatton also denied involvement in the criminal activity charged in the indictment. *See generally* Trial Transcript at 112–118.

6. We observe that in *United States v. Danzey*, 594 F.2d 905, 913 (2d Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979), the court acknowledged that *relevant* bad act evidence could be used when the defendant denies his involvement in the crime charged. *See also* 2 J. Wigmore, *Evidence* § 304, at 202–204 (3d ed. 1940). Since we have found that the evidence in this case was not substantively or temporally relevant to the crimes charged in the indictment, we need not discuss the wisdom of this interpretation of the Rule 404(b) exceptions. We merely point out the existing authority as possible support for the government's good faith in this case.

mutual involvement was insufficient to warrant a joint trial. They assert that a joint trial in these circumstances seriously endangered their presumption of innocence and could have led the jury to convict them not on their own involvement but on their association with others. Our review of the record satisfies us that the trial judge did not abuse his discretion in refusing to order separate trials. Admittedly, no conspiracy was charged. However, "[t]he fact that no conspiracy was charged does not indicate that there was a misjoinder." *United States v. Russo*, 480 F.2d 1228, 1237 (6th Cir. 1973), *cert. denied*, 414 U.S. 1157, 94 S.Ct. 915, 39 L.Ed.2d 109 (1974). Nevertheless we note that even had the defendants been granted separate trials, the prosecution could and would largely have introduced much if not all of the same testimony against each defendant.

Moreover, it does not appear to be seriously argued that the government was without power to join the three counts in one trial, within the language of Fed.R. Crim.Pro. 8. Where defendants have been properly joined under Fed.R.Crim.Pro. 8(b), a "strong showing of prejudice" must be made in order to obtain a reversal. *United States v. Thomann*, 609 F.2d 560, 564 (1st Cir. 1979).[7] Furthermore, under Rule 14, the trial judge possesses broad discretion to grant or deny a motion for severance, and only if an abuse of discretion is demonstrated will a court of appeals overturn his decision. *See United States v. Jabara*, 618 F.2d 1319, 1328 (1st Cir.), *cert. denied*, 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980); *United States v. Ortiz*, 603 F.2d 76, 78 (9th Cir. 1979), *cert. denied*, 444 U.S. 1020, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980). Given that the evidence against the defendants was substantially similar as to each defendant, that there was evidence showing their involvement in a series of acts or course of conduct, and that the trial judge gave instructions regarding the specific elements of the crime to be proven for each defendant, we do not find an abuse of discretion in

jointly trying the defendants. *See Jabara, supra; United States v. Zozlio*, 617 F.2d 314 (1st Cir. 1980); *United States v. Jackson*, 549 F.2d 517 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *United States v. Hamilton*, 492 F.2d 1110 (5th Cir. 1974); *United States v. Bedgood*, 453 F.2d 988 (5th Cir. 1972); *United States v. Archie*, 452 F.2d 897 (3rd Cir. 1971), *cert. denied*, 405 U.S. 1071, 92 S.Ct. 1521, 31 L.Ed.2d 804 (1972).

■ Terrell and Lawson claim there was insufficient evidence to connect them with the crimes charged in counts 1 and 2 and a similar claim is made by Jay Hatton with respect to count 3. Without reviewing in detail all of the evidence, it is sufficient to observe that in each instance there was adequate evidence not only to connect the defendants with the crime charged but to show them actively participating either directly or indirectly by aiding and abetting in the receipt and concealment of the stolen property. The claim that their presence at the scene of the crime alone is insufficient to convict them is particularly unavailing in view of the role each played, whether providing a place of operations, inventorying the stolen goods, transporting them about in the course of negotiations for sale, or posting a look-out to prevent detection. In each instance there was a solid "business" reason for the defendant to be present at the scene, to be interested in the outcome and to have acted to further the course of criminal conduct.

■ Finally, some of the defendants claim that the trial judge erred in admitting certain statements which they claim were hearsay and ought to have been excluded or the subject of a cautionary instruction. Although a conspiracy was not charged, the admissibility of hearsay evidence is governed by the state of the facts at issue rather than the nature of the charge. Considered in this light, we find no reversible error. The trial judge was in-

---

7. Rule 8(b) provides that joinder of defendants is proper when the parties are alleged to have participated "in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."

deed uncertain as to the applicability of *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978), in the absence of a conspiracy count. The judge did instruct the jury with respect to their consideration of hearsay evidence, perhaps with the hope that an *Enright* determination would justify the admission of the hearsay evidence and obviate the jury instructions. Although the procedure was somewhat unusual, we are persuaded that the error, if any, in the trial judge's handling of this issue was harmless, especially in the absence of any meaningful objection to the manner in which he proceeded.

Accordingly, the cause is remanded to the district court with directions to amend the judgment of conviction by merging counts 1 and 2, and by merging the consecutive sentences imposed upon each of the defendants in counts 1 and 2 into one conviction and one sentence of 10 years imprisonment and a $10,000 fine, that single sentence to be served consecutive to the sentence imposed upon count 3, as applicable.

Affirmed in part and reversed in part and remanded with instructions.

Tax Court, 71 T.C. 443 entered decision in favor of taxpayers, and appeal was taken. The Court of Appeals held that Tax Court did not err as a matter of law in finding under facts that taxpayers were entitled to report sale of stock in a closely held corporation under the installment method.