UNITED STATES of America,
Plaintiff-Appellee,

v.

Leonard O. BOWLING,
Defendant-Appellant.

No. 80–3684.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 15, 1981.

Decided Dec. 17, 1981.

Certiorari Denied Feb. 22, 1982.
See 102 S.Ct. 1475.

Arnold Morelli, Cincinnati, Ohio, for defendant-appellant.

James C. Cissell, U. S. Atty., Nicholas J. Pantel, Asst. U. S. Atty., Cincinnati, Ohio, for plaintiff-appellee.

Before MERRITT and MARTIN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

PHILLIPS, Senior Circuit Judge.

Leonard Bowling appeals from his conviction for interstate transportation of stolen property having a value in excess of $5,000, in violation of 18 U.S.C. §§ 2 and 2314.[1] Bowling was indicted along with Thomas C. Lawson on October 24, 1979. He allegedly had transported into Ohio over $5,000 worth of sterling silver taken during a burglary of the residence of Mr. and Mrs. Isaac Van Meter in Maysville, Kentucky. Bowling was convicted after a jury trial and sentenced to a prison term of ten years by District Judge S. Arthur Spiegal. We affirm.

I

The record contains substantial evidence from which the jury could have found the defendant guilty on all the essential elements of the crime—that Bowling and Lawson burglarized the Van Meter home on November 17, 1978, stole sterling silver with a value well over $5,000, and transported it from Kentucky to Ohio for the purpose of selling it to a "fence."

1. 18 U.S.C. § 2314 provides as follows:

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

\* \* \* \* \* \*

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. 18 U.S.C. § 2 is as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. June 25, 1948, c. 645, 62 Stat. 684; Oct. 31, 1951, c. 655, § 17b, 65 Stat. 717.

According to testimony adduced at trial, the burglars drove to Maysville, Kentucky, in defendant Bowling's car on November 17, 1978. During the daylight hours the burglars "cased" a number of houses in Maysville and selected several, among them the Van Meter home, for robbery later that night. After dark they parked Bowling's automobile near a hospital located at the bottom of a hill, below the houses to be robbed. The burglars then climbed up the hill and proceeded to break into the houses.

Using a screwdriver, they took off a door of the Van Meter home. Defendant Bowling went upstairs to watch out the front window while the other two burglars grabbed some pillowcases from a bedroom and stuffed them with valuables. Between them they took approximately 37 pounds of sterling silver. This silver was "stashed" in the woods while they robbed another house; they then returned and loaded all the stolen goods in the trunk of Bowling's automobile.

Mr. and Mrs. Van Meter were in Florida on vacation at the time of the robbery, but Mrs. Fannie Johnson, whom they employed as their maid, entered the house on the day following the burglary. She testified that the door in the kitchen had been destroyed and that in every room drawers had been forced or thrown open and their unstolen contents tossed and scattered on the floor. The silver had been taken from the kitchen and dining room, with a few stray pieces left amidst the debris on the floor. An old desk in the study and a secretary in the living room had been rifled, and the Van Meters' papers and records thrown on the floor. The upstairs also had been ransacked. Mrs. Johnson testified that the closet had been wrecked, a file cabinet jammed and dresser drawers overturned and emptied.

Mrs. Van Meter also testified at trial, positively identifying the stolen silver as her own. Testimony also established that the value of the silver was well in excess of $5,000.

After they had completed the robberies, defendant and the other burglars drove back into Ohio in defendant's car. They carried the stolen silver to Bowling's home, where, with the assistance of Bowling's wife, they weighed and inventoried it and verified that it was sterling.

They had arranged to sell the silver to a "fence" named "Dick Dalton" for $55 a pound. "Dick Dalton" was the alias of an undercover FBI special agent named Richard Dorton. On November 21, 1978, Special Agent Dorton went to Bowling's residence and paid Bowling $752 in cash for his share of the stolen sterling silver.

Bowling left Ohio for Florida in September 1979, and the indictment against him in the present case was filed on October 24, 1979. He was arrested in Florida on May 23, 1980. On his person at the time of his arrest was a Florida driver's license with his picture, issued in the name of Chester G. Hornbeck, as well as a social security card and an Ohio birth certificate bearing the same fictitious name.

## II

Special Agent Dorton's role as a "fence" in this case was part of a larger FBI investigation of an interstate burglary ring based in the Cincinnati area and operating in Ohio, Wisconsin, Virginia, Tennessee, Kentucky and Illinois. In late 1977, Robert Miller, a paid FBI informant, infiltrated the ring.

This court on two prior occasions upheld convictions arising out of the investigative work of Dorton and Miller. *See United States v. Reed*, 647 F.2d 678 (6th Cir. 1981); *United States v. Brown*, 635 F.2d 1207 (6th Cir. 1980). In *Reed, supra*, we described the arrangement between Dorton and Miller:

[T]he government's prosecution of the substantive offenses proceeded on the theory that the defendants were participants in a burglary and fencing operation which centered in Middletown, Ohio. The operation was broken when a convicted Middletown burglar, one Robert Miller, agreed to cooperate with federal authorities in exchange for possible lenient treatment on a number of outstanding charges against him. FBI special agent

Richard Dorton, using the name Dick Dalton and posing as a Floridian dealer in stolen property, was brought in as an undercover agent to work with Miller and infiltrate the Middletown burglary and fencing ring. 647 F.2d at 680.

In the instant case, Miller, in cooperation with the FBI, won the confidence of Bowling and Lawson and was invited to accompany them on their burglaries. He entered the Van Meter home with Bowling and Lawson and assisted in its burglary. The record contains testimony to the effect that Miller was asked by Bowling and Lawson to suggest a place to go to on their burglarizing expedition, and Miller mentioned there were "a lot of nice houses" in Maysville, Kentucky. Bowling adopted this suggestion because he had seen the houses on top of the hill in Maysville when driving to and from his job every day.

Bowling contends in his brief that Miller's behavior and the Government's use of his cooperation during the investigation of Bowling was conduct "so outrageous that due process principles bar his [Bowling's] conviction for interstate transportation of stolen property."

We hold that Bowling has not shown that the challenged Government conduct amounts to "a denial of fundamental fairness, shocking to the universal sense of justice," *Betts v. Brady*, 361 U.S. 455, 462, 62 S.Ct. 1252, 1256, 86 L.Ed. 1595 (1942); *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960), which would then be a violation of the Due Process Clause. *See also United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973).

Our conclusion is consistent with our previous decision, *United States v. Brown, supra*, involving similar alleged improper conduct of the same Government informant, Robert Miller. In that decision we said:

The facts of this case involve the government's investigation, designated by the code name HAMFAT, of an interstate burglary ring. The ring operated, with a base in the Cincinnati area, in Wisconsin, Virginia, Tennessee, Kentucky and Illinois. In late 1977, Robert Miller, a paid FBI informant, infiltrated the interstate burglary ring. His job was to identify the individuals involved in the burglary ring, and to identify the "fences" who purchased the property stolen by the ring. In addition, Miller was to help Richard Dorton, an undercover FBI agent posing as an out-of-state buyer of stolen property, to gain the confidence of the ring.

Miller remained on the job, reporting to the FBI daily, for almost seventeen months.

\* \* \* \* \* \*

Thus, we begin our analysis with the basic proposition that the use of paid informants to infiltrate criminal enterprises is a "recognized and permissible means of investigation." *Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643. *See also, e.g., United States v. McQuin*, 612 F.2d 1193, 1195 (9th Cir.), *cert. denied*, 445 U.S. 954, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (infiltration of criminal ranks by government long recognized as permissible); *United States v. Twigg*, 588 F.2d 373, 380 (3rd Cir. 1978) (infiltration of criminal operations is an "accepted and necessary practice"); and *United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir. 1978), and cases cited therein.

This proposition remains true even though the informant or government agent engages in some criminal activity or supplies something of value to the criminal enterprise. The informant or government agent must be allowed to further the interests of the criminal enterprise in some manner to gain the confidence of the criminal elements with which he must deal. *See Russell, supra*, at 432, 93 S.Ct. at 1643; *McQuin, supra*, 612 F.2d at 1196; *United States v. Corcione*, 592 F.2d 111, 114–15 (2d Cir.), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794 (1979). 635 F.2d at 1208–09, 1212–13.

In the context of the facts of the present case, the Government did not instigate the burglary of the Van Meter home on Novem-

ber 17. Miller, the Government informant, did not organize the burglary trip in question or even select the date for the trip. Miller did not recruit either Bowling or Lawson to burglarize homes. His activities were consistent with the necessity of keeping his credibility established with the burglars in order to maintain his effectiveness as an informer.

Applying to the present case the factors discussed in *Brown, supra*, 635 F.2d at 1211–14, the Government did not initiate the criminal activity here in question. To the contrary, it merely infiltrated a preexisting criminal enterprise. Robert Miller did not direct or control the activities of the criminal enterprise. To the contrary he merely acquiesced in its criminality.

We adhere to our holding in *Brown*:

On the facts presented by this record, the court finds no violation of due process. Although the individual burglars and fences might be detectable without infiltration, certainly the use of this investigative technique facilitated a more expeditious and thorough investigation. The burglary ring under investigation, like many drug rings, would have been extremely difficult to thwart without the use of Miller as an undercover agent.

There is no showing of any kind that Miller, or any of the FBI agents involved in this case, instigated any criminal activity. The burglary ring was fully operative when Miller "joined" it. Even after Miller joined the ring, it appears that his participation in its criminal endeavors was limited to following the members' instructions. Miller was instructed by the FBI to participate in criminal activity only if failure to do so would endanger his life. Nothing in the record suggests that he departed from these instructions. Further, once the government "fence" was taken into the confidence of the ring, Miller's involvement was terminated.

We find that, in its use of Miller, the government in no way increased the number of burglaries, or the likelihood of their success. Miller reported to the FBI on a daily basis. He revealed the location of burglaries and sometimes provided an inventory of the things taken, thus facilitating the recovery of stolen items such as those that form the basis of Brown's conviction. Although it did not materialize, Miller's presence also provided the FBI with a possible source of advance notice of burglaries. Miller also could have prevented personal injury to surprised occupants if the need had arisen. The only effect Miller's presence had on the activities of the ring was that the FBI was informed of the illegal activity in which the ring was engaged. Nothing in the facts convinces us in the least that Miller's conduct was "shocking to the universal sense of justice." *Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643. 635 F.2d at 1213–14.

### III

Bowling contends that the district judge erred in overruling his motion to immunize Thomas Lawson as a witness in this case. In *United States v. Lenz*, 616 F.2d 960 (6th Cir.), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980), this court held that defendants have no compulsory process right to have their favorable witnesses immunized. The decision of the district court in refusing to grant immunity to Lawson is supported fully by *Lenz*.

### IV

Bowling asserts numerous other grounds for reversal of his conviction, including:

(1) That the district court erred in permitting the introduction of evidence concerning Bowling's flight and concealment in Florida;

(2) That the court erred in admitting into evidence without proper foundation and permitting the jury to consider a tape recording containing material omissions and ambiguities;

(3) That the district court erred in overruling defendant's objections and his motion for a mistrial based on testimony regarding offenses not described in the indictment; and

(4) That the district judge was guilty of reversible error in his charge to the jury.

Upon consideration, the court concludes that all the grounds for reversal asserted by appellant are without merit.

The judgment of conviction is affirmed. The court expresses appreciation to Mr. Arnold Morelli of the Cincinnati bar for his services as court-appointed counsel for Bowling in the district court and on this appeal.

BOYCE F. MARTIN, Jr., Circuit Judge, concurring.

I agree with the majority that Bowling's conviction should be affirmed. I write separately merely to augment the majority's cogent reasoning on the immunity issue and to address briefly a few of Bowling's alternative contentions.

I fully agree that defendants have no compulsory process right to compel immunization of favorable witnesses, except in extraordinary circumstances, which are not present here. *See United States v. Morrison*, 535 F.2d 223 (3rd Cir. 1976). We stated in *Lenz* that "18 U.S.C. § 6003 commits the decision to grant or deny immunity to the sole discretion of the executive branch of government." 616 F.2d at 962. The record contains no evidence that this statute as applied denied Bowling either compulsory or due process. The government neither granted nor denied immunity selectively. Miller was not immunized for purposes of Bowling's trial. He had received a promise of relief from state charges he faced long before Bowling's prosecution. He was a paid informant with a long history of government cooperation. *See United States v. Ramsey*, 503 F.2d 524 (7th Cir. 1974), *cert. denied*, 420 U.S. 932, 95 S.Ct. 1136, 43 L.Ed.2d 405 (1975). Nor does the record contain evidence that Lawson was threatened with prosecution in the event he testified. *See United States v. Morrison, supra.* Under these circumstances, where no prosecutorial misconduct was shown, the District Court correctly denied Bowling's motion.

I agree that Bowling's other contentions are without merit, for the following reasons. First, evidence of Bowling's flight was harmless error, adequately cured by a cautionary instruction. Over defense counsel's strenuous objection, the District Court initially permitted government witnesses to testify about Bowling's flight to Florida and assumption of a false identity. The trial judge recanted, however, at the close of all the evidence, concluding that this evidence was inadmissible under *United States v. Myers*, 550 F.2d 1036 (5th Cir. 1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978). He then suppressed the false identification and instructed the jury to disregard the flight testimony.

Before this court, Bowling argued that the cautionary instruction was inadequate because it did not refer specifically to the damaging testimony. Had the District Court given a flight instruction, we might be required to reverse. However, Bowling did not object to the cautionary instruction before the jury retired. Under Federal Rule of Criminal Procedure 30, Bowling did not preserve this alleged error for review. . Even had Bowling made a timely objection, in my view the admission was harmless error beyond a reasonable doubt. The District Court did not permit the government to mention Bowling's flight in closing argument. *See United States v. Jackson*, 572 F.2d 636 (5th Cir. 1978). More importantly, as the majority points out, evidence of Bowling's participation in transporting the silver across state lines was conclusive and overwhelming. In a closer case I might be persuaded that the vague instruction was insufficient to cure any possible prejudice. Given the facts of this case, however, the instruction was adequate.

Second, in my view, the tape of Agent Dorton's "pay-off" meeting was properly admitted. The trustworthiness of a tape recording is left to the sound discretion of the trial judge. *United States v. Enright*, 579 F.2d 980 (6th Cir. 1978). *See also United States v. Crane*, 632 F.2d 663 (6th Cir. 1980). The District Court carefully reviewed those portions of the tape that were

inaudible or irrelevant, and partially granted Bowling's suppression motion, approving only those portions that specifically related to the silver transaction. I note that Bowling did not object to the jury's use of a transcript to help them follow the recording. The record does not support Bowling's claim that the trial judge abused his discretion. *United States v. Reed*, 647 F.2d 678 (6th Cir. 1981).

Finally, I agree that Bowling was not prejudiced by evidence of "bad acts" or other crimes based on government testimony. Specifically, Miller testified on direct examination that once he went to Bowling's house to pick up a load of guns. On cross-examination Miller testified that once he used cocaine at Bowling's house. Defense counsel objected to the gun reference and moved for a mistrial. Instead, the trial judge gave a cautionary instruction. Miller volunteered the cocaine reference in response to cross-examining questions about his drug use. Defense counsel objected to Miller's answer on the ground that it was non-responsive. Subsequent requests for an instruction and a mistrial were denied.

Although I reject Bowling's argument that the cumulative effect of these bad act references substantially prejudiced his right to a fair trial, I am troubled by the striking similarity between the conduct in this trial and that in *Reed*. As the majority indicates, *Reed* involved the same cast of government characters: Miller and Dorton. In my opinion, the methods Miller employed at Bowling's trial are equally suspect as those Judge Engel criticized in *Reed*. Miller was eager to volunteer his opinion that Bowling's and Lawson's friends were "burglars", and that they associated with the infamous, unsavory "Office II" crowd. The trial judge diligently tried to diminish the impact of Miller's statements. Nevertheless, the jury heard much damaging testimony.

However, as I view the entire record, I am not convinced that other crimes evidence "so adversely affected the substantial rights of the defendant as to require reversal." *Id.* at 687. Again, evidence of Bowl-

ing's complicity was overwhelming. Miller's testimony, admittedly that of a witness eager to cooperate, was corroborated by that of Dorton, and by tape recordings. The trial judge adequately cautioned the jury to disregard the gun testimony. The cocaine reference was a response to an aggressive line of cross-examination calculated to impeach Miller. As the District Court admonished, defense counsel invited Miller's response by his line of questioning and thus himself significantly increased the risk of eliciting a damaging response. *See United States v. Feroni*, 655 F.2d 707 (6th Cir. 1981). For these reasons, I conclude that we must affirm the conviction.