819 F.2d 290
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Jerome SUMPTER, Defendant-Appellant.
 No. 85-3953.
 United States Court of Appeals, Sixth Circuit.
 May 22, 1987.
 
 Before MARTIN, GUY and NORRIS, Circuit Judges.
 NORRIS, Circuit Judge.
 
 
 1
 Defendant Michael J. Sumpter appeals from his judgment of conviction entered on the verdict of a jury after a three-week trial, on 22 counts of a 24-count indictment charging him with violating federal drug laws. Other persons named in the indictment entered guilty pleas to charges of conspiracy to distribute cocaine.
 
 
 2
 Defendant was found guilty of engaging in a continuing criminal enterprise from the summer of 1981 to February 20, 1985, in contravention of 21 U.S.C. Sec. 848 (Count 1); conspiracy to distribute and to possess with intent to distribute cocaine in violation of 21 U.S.C. Sec. 846 (Count 2); possessing cocaine with intent to distribute contrary to 21 U.S.C. Sec. 841(a) (1) and 18 U.S.C. Sec. 2 (Counts 5, 6, 8-10, 12-18, 21-24); and illegally using a telephone to facilitate the distribution of cocaine in violation of 21 U.S.C. Sec. 843(b) (Counts 7, 11, 17, 19, 20). The jury also rendered a special verdict on the continuing criminal enterprise offense, finding that over $1,000,000 of defendant's assets were subject to forfeiture under 21 u.s.c.Sec. 48(a) (2).
 
 
 3
 In challenging his convictions, defendant raises these issues: (1) that the trial court erred in refusing to order the government to disclose exculpatory materials; (2) that he was entrapped as a matter of law; (3) that his conviction should be barred because of outrageous conduct by the government; and (4) that the jury's special verdict of forfeiture was unfounded, because the evidence was insufficient to support the conviction of engaging in a continuing criminal enterprise.
 
 
 4
 * The case against defendant and the other co-conspirators was developed through the investigative work of an undercover FBI agent, Theodore Domine. In 1981, Frank Sumpter,[1] defendant's father, disclosed to federal agents his prior involvement in bribing public officials in the Cleveland area, and offered to cooperate with the government in investigating ongoing criminal activities.
 
 
 5
 In the fall of 1981, Frank Sumpter introduced Domine to Michael Sumpter. This meeting was arranged by the former because he believed that his son might be involved in gambling and he wished to have Domine, who was posing as a Mafia "hitman", intimidate him into refraining from such activities. Later, Frank Sumpter advised his son that Domine was an FBI agent conducting an undercover investigation.
 
 
 6
 Commencing in July 1982, defendant joined his father in becoming an FBI informant. Both provided significant information regarding drug trafficking in northern Ohio. This relationship terminated in July 1983, when Domine informed defendant that he suspected him of trafficking in narcotics.
 
 
 7
 Federal agents then began a surveillance of defendant's activities. Numerous phone conversations between defendant and his co-conspirators were taped; some were later played at trial. These recordings revealed an extensive and highly sophisticated conspiracy being managed by defendant from his Beachwood, Ohio home, and involving approximately 11 other individuals and numerous sales of narcotics in the Greater Cleveland area. The organization utilized "mules" as couriers to transport the cocaine into Ohio and employees to distribute the cocaine out of various retail and wholesale drug centers. According to testimony at trial, defendant occupied the position of supervisor of the operation and was referred to by the conspirators as "boss" or "Don Corleone." He exercised the ultimate authority over the proceeds from the narcotics sales and the paying of salaries to his associates.
 
 
 8
 Witnesses described several drug transactions in which large quantities of cocaine were transported into Ohio and delivered to defendant. An important witness, Patrick "Sonny" Fogarty, a co-conspirator, testified that he had been employed as a courier from August 1984 until February 1985, and that depending upon the mode of travel, defendant paid him from $1,000 to $2,000 for transporting cocaine from Florida to Cleveland.
 
 
 9
 Fogarty further explained in detail the operation of the drug network. He stated that in 1984 and 1985 defendant used a store on Hough Avenue for the retail distribution of cocaine. Through two confederates, defendant would have the cocaine separated and wrapped into one-half gram packets of waxed paper. These packets would then be delivered to the store by courier and sold.
 
 
 10
 Fogarty also testified that defendant supervised the operating of a wholesale cocaine distributorship from two apartments located at 2804 South Moreland in Cleveland. Solicitations of drug orders by purchasers were accepted by defendant's associates over the phone at these locations. Another witness, James Chandler, testified that in the fall of 1984 defendant told him that if he ever wanted to purchase cocaine to call him at the telephoned number of an apartment located on South Moreland. Chandler further testified that on three separate occasions he ordered one-eighth ounce quantities of cocaine by using the number given him by defendant. He stated that when he arrived at the South Moreland apartment he was permitted to enter only after being recognized and that on each occasion defendant personally sold him cocaine.
 
 
 11
 Intercepted telephone conversations corroborated the testimony of Fogarty and Chandler regarding Sumpter's supervisory role in the drug conspiracy during the period from December 20, 1984 to February 20, 1985.
 
 
 12
 There was also testimony by Gary Burke, a second cooperating witness, which established defendant's involvement in the conspiracy. Burke indicated that he began delivering kilogram quantities of cocaine to defendant at the store on Hough Avenue in the spring of 1982. Burke stated that these deliveries continued on a regular basis until his arrest in 1983. Defendant concedes to his having received several kilograms of cocaine from Burke and his having distributed it for profit but claims he was authorized to do so by the government.
 
 
 13
 The conspiracy was finally ended on February 20, 1985 when an intercepted telephone conversation between defendant and his wife revealed his intention to destroy records of the illegal sale of narcotics located at his residence. The FBI, faced with the destruction of valuable evidence, obtained search warrants for the defendant's house as well as the other apartments and residences being used by members of the drug network. Although the records of drug sales had been destroyed before the defendant's residence could be secured by federal agents, a total of $64,497.40 in cash was seized. A significant amount of cash was also confiscated at other properties linked to the conspiracy, including $42,000 seized at an apartment on Mayfield Road, and $289,481.40 contained in numerous paper bags inside two cedar chests at defendant's mother's residence in Cleveland Heights, Ohio. Records describing the incomes derived from drug sales between February 7 and February 19, 1985 were also attached to the paper bags.
 
 
 14
 There was a considerable amount of other evidence adduced at trial implicating defendant in the conspiracy.
 
 II. Entrapment
 
 15
 We consider first defendant's contention that his conviction should be set aside on the ground that he established entrapment, as a matter of law. He argues that Domine induced him to engage in illegal transactions in which he otherwise would not have engaged. Defendant claims that Domine, with the assistance of Frank Sumpter, converted him into a federal agent "having a license to commit ordinary crimes in the name of law enforcement. "
 
 
 16
 In order to establish the defense of entrapment, it must be demonstrated that the criminal design originated with a government agent, who implanted it in the mind of an otherwise innocent person, and engaged in conduct which overbore the person's will and thereby induced him to commit a criminal act that he was not disposed to commit, in order that the government might prosecute him. See United States v. Hodge, 539 F.2d 898, 906 (6th Cir. 1976), cert. denied, 429 U.S. 1091 (1977); United States v. Ambrose, 483 F.2d 742, 746 (6th Cir. 1973). To raise his defense that the government agent corrupted him, then, the defendant must produce evidence of both solicitation by the government and unreadiness on his part. Once entrapment has been asserted as a defense, by evidence either in the government's case-in-chief, or in defense, the burden of proof is on the government to prove beyond a reasonable doubt that the defendant had a predisposition to commit the crime. United States v. Jones, 575 F.2d 81, 83 (6th Cir. 1978). Accordingly, the principal element of the defense, and the focus of inquiry, becomes the defendant's lack of predisposition. United States v. Russell, 411 U.S. 423, 433 (1978).
 
 
 17
 On the basis of the record before us a rational jury could find that defendant was predisposed to commit the crimes involved. There is evidence that defendant played an active role in arranging the transporting of narcotics to Ohio. Further, the evidence demonstrated that he was willing without persuasion to involve himself in selling and distributing the cocaine once it arrived in Cleveland. These acts were performed independently from his role as a government informant. Agent Domine did not instigate defendant's commission of these crimes. Although defendant testified that he had previously never been involved in the sale of narcotics prior to his having been pressured into doing so by Domine, other evidence established that defendant readily engaged in a number of separate offenses while accepting large sums of money for himself and exerting supervisory authority over the others participating in the conspiracy. The very extent of these activities belies defendant's contention that they were the product of an innocent, but overborne will.
 
 
 18
 Nor was there any evidence of inducement by government agents other than defendant's own self-serving and uncorroborated testimony. Domine stated that he never instructed defendant to sell any of the cocaine which he had received during the period of his cooperation with the government. The jury as the trier of fact was free to credit Domine's testimony. Further, defendant's conduct and the evidence of his continued acts of engaging in illicit drug transactions is wholly inconsistent with his claim of entrapment. Accordingly, there was a sufficient evidentiary basis for the jury to conclude beyond a reasonable doubt that defendant was predisposed to commit the crimes for which he was convicted.
 
 III. Outrageous Police Conduct
 
 19
 Defendant also contends that his conviction should be overturned on the basis of "outrageous government conduct", relying upon language found in the Supreme Court's opinions in Hampton v. United States, 425 U.S. 484 (1976), and United States v. Russell, 411 U.S. 423 (1978). Those opinions appear to mark the only instances where the Supreme Court has discussed the contention that, even where the defense of entrapment is not available due to the predisposition of the accused to commit the offense, nevertheless some government conduct may be so outrageously egregious as to violate the due process rights of the accused or to warrant dismissal pursuant to the general power of courts to supervise the law enforcement process. In neither case did the Supreme Court conclude that the circumstances then before it warranted application of such a proposition.
 
 
 20
 This court has been called upon frequently to reverse a conviction on the basis of such an "outrageous conduct" defense, and has just as frequently evidenced its reluctance to do so in the absence of a showing that the challenged government conduct is so outrageous and shocking to the court's sense of justice as to deny the fundamental fairness required by the Due Process Clause of the Fifth Amendment. See United States v. Brown, 635 F.2d 1207, 1212 (6th Cir. 1980). Accordingly, the defense will rarely, if ever, be available. United States v. Leja, 563 F.2d 244, 246 n.4 (6th Cir. 1977), cert. denied, 434 U.S. 1074 (1978).
 
 
 21
 Defendant asserts that the outrageous conduct by the government in this case consisted of Domine having employed reprehensible police tactics in recruiting defendant as a government informant, facilitating the criminal enterprise by authorizing and endorsing the sale of cocaine, and of Domine himself engaging in the illegal use of narcotics. Defendant claims that these activities caused him to become "hooked" on cocaine and more extensively involved in narcotics trafficking.
 
 
 22
 We have noted previously some of the inquiries which are relevant to evaluating a contention that police conduct is outrageous. For example, in United States v. Robinson, 763 F.2d 778, 785 (6th Cir. 1985), these factors were noted as relevant: (1) the need for the type of police conduct; (2) the impetus for the scheme; (3) the control the government exerted over the criminal enterprise; and (4) the impact of the police activity on the commission of the crime. See also United States v. Norton, 700 F.2d 1072, 1075 (6th Cir.), cert. denied, 461 U.S. 910 (1983). Additional factors were discussed in United States v. Brown, 635 F.2d at 1211-13.
 
 
 23
 Clearly, the government's use of Domine in his undercover capacity to investigate covert drug operations was warranted under the circumstances. Conspiracies involving drug-related offenses, by nature, are carried out in a shroud of secrecy to avoid detection by the authorities. Infiltration of these criminal operations by enforcement personnel and limited participation in their unlawful practices has long been recognized as a permissible means of investigation. See United States v. Russell, 411 U.S. at 432.
 
 
 24
 Defendant contends that his becoming a drug dealer received its impetus from Domine. He testified that he had been instructed to involve himself with drug traffickers so that he would be in a position to lure unsuspecting criminals to Cleveland for arrest by the FBI. Defendant maintains that when he first met Gary Burke in 1982 he was given permission by Domine to sell the one-half kilogram of cocaine which Burke had delivered and for which Frank Sumpter had paid $57,000, because the FBI had not allocated any funds for its purchase. However, this testimony was directly controverted by Domine who stated that he advised Frank Sumpter that he was not to purchase any cocaine from Gary Burke, that he had previously informed defendant that if he violated any federal, state or local laws he would be prosecuted and that he was not in receipt of any promise of immunity from the FBI for committing any criminal acts.
 
 
 25
 We are not persuaded that the evidence supports defendant's argument that the government instigated his ventures into the drug trafficking business. Instead it points to the criminal conspiracy having originated in the mind of the defendant and having been carried out without intervention by the government. It was defendant, according to Fogarty's testimony, who supervised the running of the wholesale and retail drug distributing centers. This testimony was corroborated by wiretap evidence. Further, it was Frank Sumpter who paid the money to Gary Burke in exchange for cocaine which he had received specific instructions from FBI agents not to purchase. And it was defendant, without any urging by any government agent, who sold cocaine to James Chandler on three different occasions. Far from being a case in which the police initiated and controlled a criminal scheme, this case presents the situation where a government informant abused his special status in order to engage in the narcotics business behind the government's back.
 
 
 26
 Defendant insists that Domine's activities while undercover significantly impacted his decision to engage in the illegal enterprise. For example, he alleges that Domine used cocaine when he "partied" with defendant in South Carolina, that Domine was present on one occasion when cocaine was delivered by Rosa Darville at the Hough Avenue store, and that Domine again sniffed cocaine while failing to make any arrests of the individuals who were there and committing crimes.
 
 
 27
 Assuming for purposes of discussion the truth of these allegations, such police conduct would not have deprived defendant of due process. See, e.g., United States v. Leja, 563 F.2d at 246-47. Where, as here, the government conduct was only collateral to the actual criminal enterprise, was unconnected to the acts with which defendant was charged, and did not offend any personal right of the defendant guaranteed by the constitution, we are unable to conclude that the conduct was so outrageous as to violate due process.
 
 
 28
 We are also unpersuaded by defendant's attempt to link the delay in the arrest of the conspirators to his claim that the government acquiesced in his dealing in drugs. Defendant contends that after Rosa Darville delivered cocaine to the Sumpters she should have been arrested. He also contends that he and other of the individuals present should also have been arrested because they were sniffing cocaine. Further, he alleges that Domine did not confiscate the cocaine delivered or inquire of its whereabouts when the meeting was concluded but permitted it to remain in the Sumpters' possession with the understanding that the drugs would be sold for profit. In essence, defendant contends that the government's conduct in failing to make timely arrests, manifests egregious police conduct condemned by Russell, because it encouraged him to engage in more serious criminal conduct.
 
 
 29
 In Brown, 635 F.2d at 1214, this court indicated:
 
 
 30
 Law enforcement officials are often presented with a formidable problem when they become aware of the criminal activity of individuals who are involved in a large criminal enterprise. The alternatives presented to those officials are exceedingly poor. They may arrest known criminals, thus ceasing their particular harmful effect on society; or they may allow them to continue in their violation of the law with the hope that further investigation will reveal a greater number of those involved in the criminal enterprise, the exposure and arrest of whom may effectively eliminate a much broader range and degree of criminal activity.
 
 
 31
 The dilemma with which FBI agents were faced in Brown is no different from that presented in the case before us. Here, Domine was forced to choose between arresting Darville and the other offenders as their criminality became known to him or to postpone arresting them in order to further the FBI's investigation. Either alternative invariably would have resulted in some detriment to society. Had the arrests been made at the times suggested by defendant, Domine's cover would have been revealed and his investigation effectively terminated. The FBI's surveillance of others connected to the drug conspiracy but whose identity had not yet become known would also have been placed in serious jeopardy. The government's conduct in choosing between these competing alternatives does not reveal an activity so egregious and upsetting to the fundamental principles of due process as to warrant reversal of the defendant's conviction. This is especially true, when one considers that the decision to delay the arrest permitted the government to eliminate a broader range of criminality as demonstrated by the arrests of Darville, her husband, and eventually defendant and those persons comprising his ring of conspirators.
 
 IV. Continuing Criminal Enterprise
 
 32
 We turn now to defendant's contention that there was insufficient evidence to support the jury's special verdict finding some of his property subject to forfeiture, as the result of his having engaged in a continuing criminal enterprise. 21 U.S.C. Sec. 848 (a) (2). The property forfeited included almost $380,000 in cash, jewelry, real property, furniture, a Rolls Royce, a Mercedes Benz, and five other expensive automobiles.
 
 
 33
 A person engages in a continuing criminal enterprise under 21 U.S.C. Sec. 848(b) if:
 
 
 34
 (1) he violates any provision of this subchapter [21 U.S.C. Sec. Sec. 801-904] or subchapter II of this chapter [21 U.S.C. Sec. 951-661 the punishment for which is a felony, and
 
 
 35
 (2) such violation is a part of a continuing series of violations of the subchapter or subchapter II of this chapter
 
 
 36
 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 
 
 37
 (B) from which such person obtains substantial income or resources.
 
 
 38
 Defendant contends that there was a lack of proof of a series of narcotics violations in the years 1981 through 1985 as charged in the indictment. In conjunction with this argument he claims that the evidence fails to establish that he received substantial income from the alleged criminal enterprise in those years as required in Sec. 848 (b) (2) (B). Based on these assertions, defendant contends that the jury's verdict finding his assets and property"were derived from his having violated the provisions of 21 U.S.C. Sec. 848 for those years cannot be sustained.
 
 
 39
 In reviewing a claim that there was insufficient evidence to support a conviction, we must determine "whether the relevant evidence viewed in the light most favorable to the government could be accepted by a reasonably-minded jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." United States v. Meyers, 646 F.2d 1142, 1143 (6th Cir. 1981) (cites omitted). See also Glasser v. United States, 315 U.S. 60, 80 (1942). Every reasonable inference from the evidence must be drawn in the government's favor. Jackson v. Virginia, 443 U.S. 307, 319 (1979). As the Supreme Court has noted: "It is for [jurors], generally, and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." United States v. Bailey, 444 U.S. 394, 414-15 (1980). Upon a review of the evidence, we conclude that there was sufficient evidence to support a conviction for engaging in a continuing criminal enterprise.
 
 
 40
 Count 1 of the indictment in its relevant part charges that:
 
 
 41
 Beginning at least as early as the Summer of 1981, and continuing through February 20, 1985, within the Northern District of Ohio and diverse other districts, MICHAEL JEROME SUMPTER, the defendant herein, did unlawfully, willfully, knowingly, and intentionally engage in a Continuing Criminal Enterprise in that he did violate Title 21, United States Code, Sections 841 (a) (1), 843 (b) and 846 as alleged in Counts II through XXIV of this Indictment, which are incorporated herein by reference which violations were part of a continuing series of violations undertaken by MICHAEL JEROME SUMPTER, in concert with at least five (5) other persons, with respect to whom MICHAEL JEROME SUMPTER occupied a position of organizer, supervisor, or manager, and from which continuing series of violations the defendant obtained substantial income and resources.
 
 
 42
 From the defendant, MICHAEL JEROME SUMPTER'S participation in the aforementioned Continuing Criminal Enterprise, MICHAEL JEROME SUMPTER obtained profits, resources and property which are subject to forfeiture to the United States pursuant to Title 21, United States Code, Section 848 (a) (2).
 
 
 43
 To establish the continuing criminal enterprise the government focused its proofs at trial on the overt acts averred in Count 2 of the indictment, charging defendant with the predicate offense of conspiring to distribute cocaine in violation of 21 U.S.C. Sec. 846. The evidence in the record, however, varies with the time alleged in the indictment to the extent that the conspiracy began one year later than the summer of 1981. Testimony had revealed that Burke made his first of a series-of deliveries of cocaine to defendant in the spring of 1982. The fact that the indictment failed to state with precision the time when the enterprise began does not render it facially defective since time was not a material element of the offense. The indictment adequately apprised defendant of the nature and identity of the offenses for which he was charged. See Berger v. United States, 295 U.S. 78, 82 (1935). Accordingly, we find no reversible error in the court's refusal to hold the indictment inadequate.
 
 
 44
 Defendant next argues that the evidence failed to demonstrate that he received substantial income from the criminal enterprise during those years. He maintains that income generated from his lottery winnings in 1983 and 1984, the proceeds from the sale of his home in 1983 and loans from his parents as well as income derived from the Sumpter family business was used to purchase the assets and real property deemed to be forfeitable by the jury.
 
 
 45
 Either direct or circumstantial evidence may suffice to prove a defendant's receipt of substantial income from the operation of a continuing criminal enterprise. See United States v. Phillips, 664 F.2d 971, 1035 (11th Cir. 1981), cert. denied, 457 U.S. 1136 (1982). Here, the evidence showed that defendant obtained several kilograms of cocaine from Burke beginning in the spring of 1982 which would have brought the defendant a handsome return upon its illegal distribution. See Phillips, 664 F.2d at 1034-35 (possession of large quantity of marijuana sufficient). These cocaine deliveries continued after Burke's arrest in 1983 when defendant began using his own employees as couriers. In addition, the evidence also demonstrated that defendant engaged in several lavish personal expenditures including several trips to Las Vegas. Although defendant testified that he had a legitimate source of income from the family businesses, he offered no evidence in support of this explanation other than his own uncorroborated statements.
 
 
 46
 The evidence supports the jury's conclusion that defendant realized substantial income from the continuing criminal enterprise and used the proceeds from that enterprise to acquire the property found to be subject to forfeiture. All the property contained in the order for forfeiture had been acquired by defendant after the spring of 1982. The jury was free to credit the government's evidence regarding defendant's income and spending habits as well as all reasonable inferences to be drawn therefrom. See United States v. Bolts, 558 F.2d 316, 321 (5th Cir. 1977), cert. denied, 439 U.S. 898 (1978); United States v. Gantt, 617 F.2d 831, 847 (D.C. Cir. 1980) (defendant's ability to purchase large quantities of narcotics and to operate large-scale narcotics business evidence of obtention of substantial income or resources); United States v. Barnes, 604 F.2d 121, 156 (2d Cir. 1979), cert. denied, 446 U.S. 907 (1980) ("[t]he jurors were entitled to draw their own inferences from evidence of the galaxy of high price automobiles, corporate-owned to shield them from forfeiture, used and/or leased by defendants."); United States v. Kirk, 534 F.2d 1262, 1278 (8th Cir. 1976), cert. denied, 433 U.S. 907 (1977) (defendant's operation of a large-scale narcotics enterprise and ability to finance cross-country transportation expenses sufficient). United States v. Chagra, 669 F.2d 241, 257 (5th Cir. 1982). The government's proof, though largely circumstantial, was sufficiently persuasive to convince the jury that defendant had received substantial income from his involvement with the continuing criminal enterprise which he used to purchase the items being forfeited.
 
 
 47
 Further, the evidence showed that there were 11 other coconspirators including couriers, packagers and sales personnel being managed by defendant. Defendant maintained at trial, however, that he worked for Dale Lackey and that Lackey rather than him ran the drug operation which involved the actual selling of the cocaine once it was received from Fogarty. Other testimony belies defendant's argument. It was established that defendant began purchasing cocaine from Burke in the spring of 1982 and storing it in drug warehouses for later distribution.
 
 
 48
 Further, defendant controlled and directed the transporting of the cocaine by couriers from Florida to Ohio in 1984 and 1985. Clearly, defendant was the kingpin of the trafficking activities and thus occupied the rank of supervisor or manager with respect to the other persons involved in the organization.
 
 V. Exculpatory Evidence
 
 49
 Defendant also contends that he was denied due process of law in violation of Brady v. Maryland, 373 U.S. 83 (1963), by reason of the failure of the government to produce for his use at trial several classified documents, which he maintains constituted exculpatory evidence. His motion in the trial court sought the government's file concerning the work of Frank Sumpter as an informant, and the personnel file of Domine. Defendant argued that these materials contained statements indicating FBI endorsement of his drug sales, and that there was corroborative proof of this arrangement in ' Domine's personnel file, showing that he had been reprimanded by his superiors in the FBI for mishandling defendant's case.
 
 
 50
 Pursuant to a request by defendant, the trial judge conducted an in camera inspection of these materials. He concluded that Domine's personnel file had no relation to defendant's testimony at trial, that defendant was only mentioned once or twice in Frank Sumpter's file, and that the requested files would not have to be disclosed because they contained nothing exculpatory in nature and did not impeach Domine's testimony.
 
 
 51
 It is well-settled that the government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment. United States v. Agurs, 427 U.S. 97 (1976); Brady v. Maryland, 373 U.S. at 87. Evidence is "material", in this context, only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Pennsylvania v. Ritchie, --U.S. ----, ---, 107 S. Ct. 989, 1001 (1987). See also United States v. Bagley, 473 U.S. 667 (1985). Impeachment evidence, like exculpatory evidence, falls within what has become known as the "Brady rule". See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Holloway, 740 F.2d 1373, 1380-81 (6th Cir.), cert. denied, 469 U.S. 1021 (1984). Having examined the materials and found nothing "material" to defendant's cause, we find no error in the trial court's view of the contents of the files.
 
 
 52
 Defendant also contends that the district court erred in denying his motions under the Jencks Act, 18 U.S.C. Sec. 3500, to compel the government to disclose the contents of the files referred to, of the classified transcript of a debriefing interview between Burke and federal agents following his arrest and the notes taken by the agents in connection with the interview, and the transcript of prior testimony by Burke in a related case. See United States v. Wilkinson, 754 F.2d 1427 (2d Cir.), cert. denied, 472 U.S. 1019 (1985).
 
 
 53
 We first address defendant's request for the transcript of Burke's testimony from the Wilkinson trial in the United States District Court for the Southern District of New York. The relevant portion of the Jencks Act, 18 U.S.C. Sec. 3500(b) reads:
 
 
 54
 (b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
 
 
 55
 A statement is "in the possession of the United States" for purposes of applying the Jencks Act if it is in the possession of the federal prosecutorial agency. See United States v. Cagnina, 697 F.2d 915, 922 (11th Cir.), cert. denied, 464 U.S. 856 (1983); United States v. Trevino, 556 F.2d 1265, 1271 (5th Cir. 1977). The transcript testimony of a witness in a prior trial is not a statement within the possession of the United States as contemplated by the Jencks Act. See Cagnina, 697 F.2d at 922. Because Burke's testimony was not within the possession of the prosecutorial agency and could have been obtained by defendant with reasonable diligence, the government had no obligation to produce it. See United States v. Campagnuolo, 592 F.2d 852, 861 (5th Cir. 1979).
 
 
 56
 Apparently, defendant requested that the trial court review in camera the F.B.I.'s files of the Burke debriefing interview following his arrest in Atlanta. The court ruled that none of those items were related to the subject matter of Burke's testimony and thus could not be used for impeachment purposes, the only permissible use thereof under the Act. See Campbell v. United States, 365 U.S. 85, 92 (1961); Palermo v. United States, 360 U.S. 343, 352 (1959). The court engaged in a balancing test and determined that the government's need to protect the sensitive information contained in the Burke transcript and agents' notes outweighed the defendant's need for complete disclosure. Nevertheless, the court did permit discovery of excised portions of Burke's debriefing statements. In his post-trial motion, defendant changed his position claiming that he was entitled to production of all of the agents' summaries of that interview and the transcript of Burke's statements. The trial court denied these motions finding no basis in defendant's contention that the requested material contained evidence which if produced would be beneficial to his case either for purposes of impeachment or to exculpate him from the crimes charged.
 
 
 57
 In United States v. Padin, 787 F.2d 1071, 1077-78 (6th Cir.), cert. denied, 107 S. Ct. 93, 93 L.Ed.2d 45 (1986), we held that a report based on the incomplete notes of an FBI agent relative to an interview he had with one of the government's witnesses did not constitute a "statement" within the meaning of the Jencks Act producible for cross-examination purposes upon demand of the defendant.n2Wenotedthat the Supreme Court in Palermo v. United States, 360 U.S. 343 (1957) "determined that by enacting the Jencks Act, Congress did not intend to permit the defense to indiscriminately impeach witnesses with statements which 'could not fairly be said to be the witnesses, own words rather than the product of the investigator's selections? interpretations, and interpolations." ' United States v. Padin, 787 F.2d at 1077. We rejected defendant's position, that the debriefing reports qualified as statements under the theory that the report was a "substantially verbatim recital" of the witness's statements as defined in 18 U.S.C. Sec. 3500(e) (2) and that the report was "otherwise adopted or approved" by the witness as defined in 18 U.S.C. Sec. 3500 (e) (1). Padin, 787 F.2d at 1077. As we perceive no distinction between the reports which had been sought in Padin and the interview notes being requested in this case, the trial court did not abuse its discretion in rejecting Sumpter's demands for production of the FBI agents' debriefing notes summarizing Burke's interview.
 
 
 58
 We find no basis for the other contentions raised by defendant in his brief in regard to the treatment of evidentiary matters by the the trial court.
 
 
 59
 Accordingly, defendant's conviction and the judgment of the district court is affirmed.
 
 
 
 [1]
 Frank Sumpter died November 12, 1983
 
 
 [2]
 The term "statement" is specifically defined in the Act:
 (e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means
 (1) A written statement made by said witness and signed or otherwise adopted or approved by him;
 (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
 (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.