**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Norbert A. BROWN,**
**Defendant-Appellant.**

No. 80–5024.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 7, 1980.

Decided Dec. 17, 1980.

Rehearing Denied Jan. 27, 1981.

**1208**

H. Fred Hoefle, Cincinnati, Ohio, for defendant-appellant.

James C. Cissell, U. S. Atty., Terry Lehmann, Christopher K. Barnes, Asst. U. S. Attys., Cincinnati, Ohio, for plaintiff-appellee.

Before ENGEL and BROWN, Circuit Judges, and PECK, Senior Circuit Judge.

BAILEY BROWN, Circuit Judge.

Appellant, Norbert A. Brown, was convicted after a jury trial in the United States District Court for the Southern District of Ohio for receiving stolen goods in violation of 18 U.S.C. § 2315. On this appeal he challenges, *inter alia*, the validity of the search of his automobile and the legality of the government's conduct during the investigation that led to his arrest and conviction. We affirm his conviction in all respects.

**I**

The facts of this case involve the government's investigation, designated by the code name HAMFAT, of an interstate burglary ring. The ring operated, with a base in the Cincinnati area, in Wisconsin, Virginia, Tennessee, Kentucky, and Illinois. In late 1977, Robert Miller, a paid FBI informant, infiltrated the interstate burglary ring. His job was to identify the individuals in-

volved in the burglary ring, and to identify the "fences" who purchased the property stolen by the ring. In addition, Miller was to help Richard Dorton, an undercover FBI agent posing as an out-of-state buyer of stolen property, to gain the confidence of the ring.

Miller remained on the job, reporting to the FBI daily, for almost seventeen months. During that time, Miller accompanied two of the members of the ring, Bobby Campbell and James E. Frazier, on approximately forty burglaries. Miller was also involved in the sale of the stolen property to fences. His involvement in the ring ended in April, 1979.

On April 19, 1978, Miller accompanied Frazier and Campbell to Kentucky where they burglarized homes in Danville and Lancaster. They returned to Ohio early the next morning. After their return, Miller informed the FBI that some of the stolen property was to be sold to Manuel Snelling, a fence who, it was known by the FBI, often made such purchases. Snelling was to meet the trio at a designated location later that morning. Consequently, the FBI placed Snelling under surveillance. Because appellant, Brown, had been observed meeting with Snelling after other burglaries, he too was placed under observation.

On the morning of April 20, 1979, Snelling met with the burglars at the designated place, ultimately buying various stolen items, including some sterling silver and jewelry.

After the meeting, the FBI observed Snelling placing a large paper bag, some pillow cases, and a small box in the trunk of his automobile. Snelling left in his car and then made a telephone call and some stops. Later that day, Snelling was observed driving south on Route 4, past Brown's coin shop. Snelling then turned around and drove north, once again past the coin shop. Turning around yet again, Snelling drove past the coin shop and out to the Tri-County Shopping Center.

Shortly after Snelling's third pass by his coin shop, Brown left the coin shop, got into his car, and drove toward the shopping center. As he neared the shopping center, Brown abruptly changed lanes, turned left against the light, and entered the parking lot. The suddenness of this maneuver cut off the FBI surveillance for a short time. The FBI agents soon saw Brown's automobile parked adjacent to Snelling's. Snelling exited his car and got into Brown's. The two men drove around the parking lot for a time, eventually returning to Snelling's car. Parked side-by-side, the two men opened the trunks to their respective automobiles. Snelling then transferred a large paper bag from the trunk of his car to the trunk of Brown's car.

After the transfer, Brown drove from the parking lot back in the direction of his coin shop, on the heavily travelled Route 4. While Brown was stopped at a traffic light, an FBI agent entered Brown's car on the driver's side, showed Brown his badge, and pulled the car off the highway.

The FBI advised Brown of his rights, although they did not arrest him. They conducted a search of his trunk, locating the large paper bag recently placed there by Snelling. Comparing the items in the bag with an inventory list provided by Miller, the agents realized that some items were missing. When they asked Brown where those items were, he told them that they were in his coat pocket. The FBI retrieved these items also. Brown was released at that time. Some months later, Brown was indicted for receiving stolen goods. From his conviction for that offense he appeals.

## II

Brown contends that the trial court erred when it admitted in evidence the items seized from the trunk of his automobile, arguing that the search for and seizure of those items was effected in contravention of the Fourth Amendment. In support of this contention Brown relies primarily on *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Because we

find that the search of Brown's automobile was lawful and that Brown had no legitimate expectation of privacy in the paper bag therein, we uphold the trial court's denial of Brown's motion to suppress.

### A

Initially we note that the search of the trunk of Brown's automobile was lawful if the officers had probable cause for the search. In *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Supreme Court noted:

> One of the circumstances in which the Constitution does not require a search warrant is when the police stop an automobile on the street or highway because they have probable cause to believe it contains contraband or evidence of a crime.

*Id.* at 760, 99 S.Ct. at 2591. The major reason for this exception to the warrant requirement is the inherent mobility of the automobile. As the Supreme Court stated in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970):

> [T]he circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Carroll* [*v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)] and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant, or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

*Id.* at 50–51, 90 S.Ct. at 1980–81. The Court then noted that the question of which of these alternatives posed the lesser intrusion, and which the greater, "is itself a debatable question." *Id.* at 51, 90 S.Ct. at 1981. The Court then held:

> For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate

and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.

*Id.* at 52, 90 S.Ct. at 1981.

We now turn to a consideration of whether the existence of probable cause and exigent circumstances justify the warrantless search of the trunk of the automobile in the instant case.

 We think that the exigent circumstances usually associated with the search of an automobile were present here. Brown's automobile was stopped during rush hour traffic on a very busy thoroughfare. There was a very real danger that any stolen goods being transported in the automobile would be secreted or melted down. As in *Chambers, supra,* if an effective search was to be made, it had to be made before the automobile eluded the police officers.

We are also of the opinion that the officers in the instant case had probable cause to search Brown's auto. The FBI knew that Manuel Snelling was a "first-level fence of stolen property." App. at 78. The FBI had, in the past, observed Brown and Snelling transacting business in parking lots in a rather clandestine manner. The FBI received information from Miller that Snelling would be picking up stolen property at a designated location. Snelling was shortly thereafter observed carrying a large paper bag, a small box, and some pillow cases from the location given by Miller and then putting these articles in the trunk of his car.

Later that day, Snelling made several "passes" by Brown's coin shop, whereupon Brown exited and drove to a meeting with Snelling at what was apparently a predetermined location, the Tri-County Shopping Center. After Snelling and Brown took a short drive around the parking lot in Brown's car, Brown parked next to Snelling's car. The FBI then observed Snelling transferring a large paper bag from his trunk to Brown's trunk. In light of the

foregoing facts, we agree with the trial court's observation that "there is all kind of evidence of probable cause." App. at 143.

**B**

With respect to Brown's contention that the FBI's search of the paper bag taken from his automobile violated the Fourth Amendment, we must determine whether Brown had a legitimate expectation of privacy in the bag, for the Fourth Amendment "protects people from unreasonable government intrusions into their legitimate expectations of privacy." *United States v. Chadwick*, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). *See also Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). If the government did not invade a place in which Brown held a legitimate expectation of privacy, there was no "search" for purposes of the Fourth Amendment, and its provisions are inapplicable. *Rawlings v. Kentucky*, —— U.S. ——, ——, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633, 642 (1980).

The determination of whether a legitimate expectation of privacy exists with regard to a particular item or place must be made on a case-by-case basis, considering those circumstances peculiar to the case before the court. Two elements must be present to justify the conclusion that Brown had a legitimate expectation of privacy in the paper bag: first, Brown must have a subjective expectation of privacy; and, second, Brown's expectation must, as an objective matter, be one that society is prepared to recognize as reasonable. *Sanders, supra*, 442 U.S. at 764, n. 13, 99 S.Ct. at 2593–94, n. 13. *See Rakas, supra*, at 143 & n. 12, 99 S.Ct. at 421 & n. 12; *United States v. Ross* (D.C.Cir. April 17, 1980).

We hold that, on the facts before us, Brown possessed no legitimate expectation of privacy in the unsealed paper bag. We do not hold that one may never have a legitimate expectation of privacy in a paper bag, for some set of facts may compel that conclusion.

Even if, as contended by Brown, the bag was closed, it was not sealed. Brown contended that he did not even know exactly what was in the bag. We find that Brown in no way evidenced an intent that the contents of the bag remain private from even the most cursory examination. In short, we find that nothing about the bag itself or the way it was used indicates an expectation of privacy like that present in the luggage of *Sanders, supra*, and *Chadwick, supra*. Thus, we agree with the District of Columbia Circuit that "absent unusual circumstances not present here, the Fourth Amendment does not forbid the police from opening a paper bag once it is properly in their hands." *Ross, supra*, at ——. We note that two other circuits faced with facts similar to those in the case at bar have reached the same conclusion. *United States v. Jiminez*, 626 F.2d 39 (7th Cir. 1980) (paper bag); *United States v. Neuman*, 585 F.2d 355 (8th Cir. 1978) (cardboard box); *see also* extensive documentation of similar cases in *Ross, supra*, at —— & n. 3.

**III**

Having disposed of this Fourth Amendment issue, we now turn to Brown's due process claims.

**A**

Brown raises two related, though not identical, issues under the Due Process Clause. Initially Brown contends that the government's conduct during the HAMFAT investigation was so outrageous and "shocking to the universal sense of justice" that due process principles bar his conviction for receiving stolen goods. Brown also contends that the government's conduct during this investigation requires this court, under due process principles or in the exercise of its supervisory powers, to suppress admission of the articles taken from the trunk of his automobile. Because we find that no due process violation is presented on the facts of this case, we reject these contentions.

In support of his contention that his conviction should be barred, Brown relies on *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell*, the Court held that the defense of entrapment was foreclosed to one who was predisposed to commit a crime, irrespective of the type and degree of government activity involved. *Id.* at 433, 93 S.Ct. at 1643. The Court did, however, hold out the possibility that due process principles might prohibit an excessive degree of government involvement, stating:

> [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183, 25 A.L.R.2d 1396 (1952)

. . . . .

*Id.* at 431–32, 93 S.Ct. at 1642–43. In the Court's only other consideration of the issue, *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975) (plurality opinion), the concurring and dissenting justices left open the possibility of a due process challenge under *Russell*. *Id.* at 495, 96 S.Ct. at 1652–53 (Powell and Blackmun, JJ., concurring); *Id.* at 497, 96 S.Ct. at 1653 (Brennan, Stewart, and Marshall, JJ., dissenting).

■ The Court made clear, however, that before the defense recognized in *Russell* can be invoked to bar a conviction, the defendant must be able to show that the challenged government conduct violates "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the

Due Process Clause of the Fifth Amendment." 411 U.S. at 432, 93 S.Ct. at 1643 (citations omitted). In *Hampton*, Mr. Justice Powell noted that "Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." 425 U.S. at 495, n. 7, 96 S.Ct. at 1653, n. 7. In this regard this court has stated that the *Russell* defense "would rarely, if ever, be available." *United States v. Leja*, 563 F.2d 244, 246, n. 4 (6th Cir. 1977), *cert. denied*, 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978).

Although the *Russell* defense has been considered only twice in the Supreme Court, it has been raised many times before the several Courts of Appeals. From these decisions emerge a variety of factors relevant to a determination of whether particular government conduct rises to the demonstrably outrageous level prohibited by the Due Process Clause.[1]

■ Thus, we begin our analysis with the basic proposition that the use of paid informants to infiltrate criminal enterprises is a "recognized and permissible means of investigation." *Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643. *See also, e. g., United States v. McQuin*, 612 F.2d 1193, 1195 (9th Cir.), *cert. denied*, 445 U.S. 954, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980) (infiltration of criminal ranks by government long recognized as permissible); *United States v. Twigg*, 588 F.2d 373, 380 (3rd Cir. 1978) (infiltration of criminal operations is an "accepted and necessary practice"); and *United States v. Prairie*, 572 F.2d 1316, 1319 (9th Cir. 1978), and cases cited therein.

This proposition remains true even though the informant or government agent

---

1. Many of these factors derive from the following passage from *Russell*:

> In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus, in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present pratices. Such infiltration is a recognized and permissible

means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice."

*Russell, supra*, 411 U.S. at 432, 93 S.Ct. 1643 (citation omitted).

engages in some criminal activity or supplies something of value to the criminal enterprise. The informant or government agent must be allowed to further the interests of the criminal enterprise in some manner to gain the confidence of the criminal elements with which he must deal. *See Russell, supra*, at 432, 93 S.Ct. at 1643; *McQuin, supra*, 612 F.2d at 1196; *United States v. Corcione*, 592 F.2d 111, 114–15 (2d Cir.), *cert. denied*, 440 U.S. 975, 99 S.Ct. 1545, 59 L.Ed.2d 794 (1979).

■ The type of criminal activity under investigation is also a relevant consideration regarding the scope of permissible government conduct. For example, the need to use paid informants to infiltrate criminal enterprises is regarded as especially necessary in the investigation of drug-related crimes. As Mr. Justice Powell has stated:

> [C]ontraband offenses ... are [especially] difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic ... Enforcement officials must be allowed flexibility adequate to counter effectively such criminal activity.

*Hampton, supra*, 425 U.S. at 495, n. 7, 96 S.Ct. 1653, n. 7. *See also Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643; *Twigg, supra*, 588 F.2d at 378 & n. 6; *United States v. Smith*, 538 F.2d 1359, 1361 (9th Cir. 1976).

Another pertinent inquiry is whether the government instigates the criminal activity in question, or whether it infiltrates a preexisting criminal enterprise. *Corcione, supra*, 592 F.2d at 115 (government conduct limited to facilitating scheme already in progress); *United States v. Gonzales*, 539 F.2d 1238, 1239 (9th Cir. 1976); *United States v. West*, 511 F.2d 1083, 1085–86 (3rd Cir. 1975); *United States v. Greenbank*, 491 F.2d 184, 187 (9th Cir.), *cert. denied*, 417 U.S. 931, 94 S.Ct. 2642, 41 L.Ed.2d 234 (1974). A related consideration is whether the government directs or controls the activities of the criminal enterprise or whether it merely acquiesces in its criminality. *Russell, supra*, 411 U.S. at 426, n. 3, 93 S.Ct. at 1640, n. 3; *Corcione, supra*, at 115; *Prairie, supra*, 572 F.2d at 1319; *Smith, supra*, at 1361–62; *United States v. Spivey*, 508 F.2d 146, 151 (10th Cir.), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

We also note that the strength of the connection, or causal relationship, between the challenged government conduct and the commission of the acts for which the defendant stands convicted is an important consideration. We agree with the Tenth Circuit that "the more immediate the impact of the government's conduct upon a particular defendant, the more vigorously would be applied *Russell's* test for constitutional impropriety." *Spivey, supra*, at 150. *See also United States v. Szycher*, 585 F.2d 443, 447–49 (10th Cir. 1978).

■ On the facts presented by this record, the court finds no violation of due process. Although the individual burglars and fences might be detectable without infiltration, certainly the use of this investigative technique facilitated a more expeditious and thorough investigation. The burglary ring under investigation, like many drug rings, would have been extremely difficult to thwart without the use of Miller as an undercover agent.

There is no showing of any kind that Miller, or any of the FBI agents involved in this case, instigated any criminal activity. The burglary ring was fully operative when Miller "joined" it. Even after Miller joined the ring, it appears that his participation in its criminal endeavors was limited to following the members' instructions. Miller was instructed by the FBI to participate in criminal activity only if failure to do so would endanger his life. Nothing in the record suggests that he departed from these instructions. Further, once the government "fence" was taken into the confidence of the ring, Miller's involvement was terminated.

We find that, in its use of Miller, the government in no way increased the num-

ber of burglaries, or the likelihood of their success. Miller reported to the FBI on a daily basis. He revealed the location of burglaries and sometimes provided an inventory of the things taken, thus facilitating the recovery of stolen items such as those that form the basis of Brown's conviction. Although it did not materialize, Miller's presence also provided the FBI with a possible source of advance notice of burglaries. Miller also could have prevented personal injury to surprised occupants if the need had arisen. The only effect Miller's presence had on the activities of the ring was that the FBI was informed of the illegal activity in which the ring was engaged. Nothing in the facts convinces us in the least that Miller's conduct was "shocking to the universal sense of justice." *Russell, supra,* 411 U.S. at 432, 93 S.Ct. at 1643.

Brown attempts to bootstrap Miller's involvement in the burglaries to the level of demonstrably outrageous conduct by dramatically emphasizing the danger of loss of property and the possibility of personal harm occasioned by the burglaries. Brown contends that after Miller accompanied Frazier and Campbell on the first burglary, they should have been arrested. If this course had been followed, argues Brown, "39 . . . burglaries would have been prevented; 39 fewer homes would have been violated; 39 fewer families endangered." Appellant's Brief at 20. We find this argument unpersuasive.

Law enforcement officials are often presented with a formidable problem when they become aware of the criminal activity of individuals who are involved in a large criminal enterprise. The alternatives presented to those officials are exceedingly poor. They may arrest known criminals, thus ceasing their particular harmful effect on society; or they may allow them to continue in their violation of the law with the hope that further investigation will reveal a greater number of those involved in the criminal enterprise, the exposure and arrest of whom may effectively eliminate a much broader range and degree of criminal activity.

This is the dilemma confronted by the FBI agents in charge of the HAMFAT investigation. They were compelled to decide whether to arrest Frazier and Campbell when their criminality became known, or to delay those arrests with the prospect of casting a much larger net, and of eliminating a much broader range of criminality. This problem reasserted itself periodically as evidence accumulated sufficient to arrest and convict other members of the ring.

The difficulty of the problem was exacerbated by the fact that either alternative chosen would result in some harm to society, for the choice of either alternative results in the continuing criminality of some members of the ring. Once the burglary ring began its criminal operations, an event the government had nothing whatsoever to do with, a certain amount of harm to society was an inevitable result. Faced with this situation, the government was forced to choose an alternative that, in its judgment, would result in the least amount of harm. This type of decision is affected by a multitude of varied and subtle considerations, with which law enforcement personnel are only too familiar. Nothing in the record before us indicates that the FBI erred so dramatically in their decision in the instant case that the fundamental canons of due process were violated.

**B**

With respect to Brown's exclusionary rule claim based on due process, Brown relies on the same government conduct discussed above in relation to his claim for relief under *Russell.* Consequently, our holding that the government did not violate due process in the HAMFAT investigation disposes of this issue also. Thus, we need not consider the applicability of *United States v. Payner,* —— U.S. ——, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), particularly whether Brown has standing under these circumstances to assert an exclusionary rule claim based on due process.

The court has carefully considered the numerous other issues raised by appellant on this appeal and finds them without mer-

it. Accordingly, the conviction of appellant for receiving stolen goods is AFFIRMED.