841 F.2d 1127
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Patrick PELKINGTON, Loynas Boquette, Peter Tranchida, and
Robert Faxas, Defendants-Appellants.
 Nos. 86-2134, 86-2138, 86-2162 and 87-1239.
 United States Court of Appeals, Sixth Circuit.
 March 7, 1988.
 
 Before NATHANIEL R. JONES, WELLFORD and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 This appeal arises out of an undercover Drug Enforcement Agency ("DEA") operation known as "Operation Camelback", which ultimately and by an indirect and sometimes uncertain path led to the indictment and conviction of the defendants for conspiracy to possess with intent to distribute and distribution of large quantities of marijuana. The defendants' primary effort on appeal is to have their convictions overturned on the ground that the indictment should have been dismissed for due process violations because of outrageous conduct on the part of the government agents in the course of the undercover operation. The defendants must meet the criteria discussing outrageous governmental conduct as a basis of dismissal as outlined in United States v. Brown, 635 F.2d 1207 (6th Cir.1980), and its progeny. We affirm.
 
 
 2
 Operation Camelback commenced in Phoenix, Arizona, in 1983 under the direction of Special Agent Delphin Von Briessen. Its purpose was to provide transportation and related facilities to individuals who required services for the transportation of marijuana and cocaine into this country and to effect the arrest of key individuals engaged in such largescale traffic.
 
 
 3
 The DEA office in Tampa, Florida, knew of a drug trafficker, Garcia, who could utilize the services offered by Operation Camelback. In March 1984, Von Briessen met with Tony Davis, a paid informant working with the DEA office in Tampa who had contact with Garcia and others suspected in this type of trafficking. Davis had been employed by the DEA as a paid informant for many years. The Garcia investigation failed, but Von Briessen and Davis then coordinated efforts to target one Alejandro Saldarriaga and his associate Saul Hernandez-Rivera, whom Davis had met during the course of his undercover work for DEA in the Tampa area.
 
 
 4
 Saldarriaga and Hernandez were interested in the importation of marijuana and cocaine into the United States and the establishment of processing laboratories in Mexico and Arizona. On April 8, 1984, Saldarriaga, Hernandez and Davis came to Phoenix to meet with Von Briessen and other agents. They agreed that if the proposed marijuana transport succeeded, Hernandez's source for cocaine, Bernardo Londono-Quintero, might also utilize the Camelback services. Davis had met Quintero previously through a relative of Hernandez, and had already discussed with him plans to import cocaine and to build cocaine processing laboratories in several locations in the United States, including Arizona.
 
 
 5
 At this point, dealing with Saldarriaga and Hernandez became a means intended to establish the Camelback transportation organization as a viable group with which largescale operators might wish to deal. Von Briessen and Davis met with Sebastian Ramirez, a principal Hernandez source. Saldarriaga, however, faded from the picture, and Davis became Hernandez's "partner" to share in the profits in the drug smuggling operation. Davis understood, however, that the DEA would not allow him actually to retain proceeds from marijuana sales.
 
 
 6
 A date of June 19, 1984, was set for delivery of approximately 26,000 pounds of marijuana to Phoenix. Hernandez advanced $60,000, which Davis couriered to Colombia to be used to pay off Colombian law enforcement authorities to ensure no interference with the transport aircraft when it came to Colombia for the marijuana shipment. While Von Briessen did not sanction this activity, he did not interfere with these plans, nor did he notify the Colombian government to avoid compromising the undercover operation.
 
 
 7
 Hernandez became suspicious of Von Briessen, unfortunately, and was also angered by Davis's direct dealings with Quintero. On June 15, 1984, Von Briessen and Davis met with an associate of Quintero, who advised them that Quintero, now a target of Camelback, was prepared to go forward with the cocaine transport regardless of whether the marijuana transport arranged for Hernandez was successful. Von Briessen and Davis were invited to travel to Colombia to work out arrangements personally with Quintero, but they declined to do so. Instead, Von Briessen proceeded with the scheduled marijuana transport, because he felt its successful completion continued to be necessary to ensure Quintero's trust and willingness to deal. He based this decision on the fact that Quintero knew the marijuana transport for Hernandez was imminent and on the known relationship between Quintero and Hernandez.
 
 
 8
 The planned June 19, 1984 marijuana delivery aborted due to problems with the aircraft. On July 18, 1984, however, the transport was successful; a private plane was utilized for the transport due to safety concerns for the DEA pilot, and $50,000 was paid for the pilot's services. Hernandez, suspicious of both Von Briessen and Davis, did not advise them immediately where or to whom the marijuana should be delivered, although he and Ramirez both wanted to sell the contraband to receive the proceeds. Von Briessen came into contact with defendant Boquette, Ramirez's "man in the United States", in hopes of establishing credibility with Hernandez. Those in charge of the undercover operation delayed the arrests of certain of the recipients of the marijuana to avoid alerting Hernandez and thus to avoid compromising the operation.
 
 
 9
 At this point, the agents were forced to become brokers rather than mere facilitators of transporting the narcotics. Word was circulated through other informants that a large amount of marijuana was available, but for some time no one came forward to purchase it. Ultimately, Boquette located individuals to sample the marijuana, and, finally, arrangements were made through defendants Faxas and Tranchida to transport the marijuana to Michigan, where it was sold to defendant Pelkington, among others.
 
 
 10
 During this process, Von Briessen supplied transportation for a portion of the payment for the narcotics. Davis was heavily involved with certain defendants, who proceeded with the transaction. Von Briessen and Davis were active in the sales negotiations, but it was defendant Faxas who dictated the destination of the marijuana. Von Briessen, Davis, Boquette and a Mr. Vichot prepared the marijuana for shipment by truck to Michigan from Arizona, where it had been stored by Von Briessen in a warehouse.
 
 
 11
 Once it arrived in Michigan, the marijuana was seized and Pelkington was arrested. Some 5,000 pounds of the marijuana, however, was never recovered. The remaining defendants were arrested a year later. Attempts to pay or reimburse Hernandez were unsuccessful because he refused to come to the United States and the DEA would not allow Von Briessen to go to Mexico or into Central America to pay him.
 
 
 12
 Davis received compensation for his role in Camelback in the amount of $2,000 per month, plus expenses. In addition, Davis was to receive compensation depending upon the number and quality of people indicted and arrested, the quantity of drugs seized, and other factors involved if the investigation were successfully pursued. Ultimately, Davis was paid approximately $50,000 in DEA funds and $69,000 in money which was obtained from the subjects of the undercover investigation--so-called "traffickers' funds." Finally, Davis filed two additional claims totalling some $300,000 based upon approximately $2.8 million realized and seized from the sales of marijuana made by the government in this case from the quantity imported through undercover DEA efforts.
 
 
 13
 Defendants Faxas, Boquette, Tranchida and Pelkington (together with 15 other persons), were each charged under indictment, for a violation of 21 U.S.C. Sec. 846, specifically conspiracy to possess with intent to distribute and distribution of marijuana. Each sought dismissal of the indictment claiming outrageous governmental conduct. Following a hearing, District Judge Gilmore denied the motions to dismiss, following which ruling each defendant entered into a Rule 11 guilty plea agreement, reserving for appeal a review of the district court's adverse determination of the motions to dismiss.
 
 
 14
 "A claim of entrapment on the basis of outrageous governmental involvement does not present any question for the jury to decide but solely a question of law for the court." United States v. Quinn, 543 F.2d 640, 648 (8th Cir.1976). Accord United States v. Wylie, 625 F.2d 1371, 1378 (9th Cir.1980), cert. denied sub nom., Perluss v. United States, 449 U.S. 1080 (1981); United States v. Johnson, 565 F.2d 179, 182 (1st Cir.1977), cert. denied, 434 U.S. 1075 (1978); United States v. Graves, 556 F.2d 1319, 1322-23 (5th Cir.1977), cert. denied, 435 U.S. 923 (1978). "[O]utrageous involvement turns upon the totality of the circumstances with no single factor controlling." United States v. Tobias, 662 F.2d 381, 387 (5th Cir.1981), cert. denied, 457 U.S. 1108 (1982).
 
 
 15
 The genesis of the "outrageous governmental conduct" defense lies in United States v. Russell, 411 U.S. 423 (1973), in which the Court held that the defense of entrapment was foreclosed to one who was predisposed to commit a crime, irrespective of the type and degree of government activity involved. Id. at 433. The Court stated, however:
 
 
 16
 [W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.
 
 
 17
 (Citations omitted) id. at 431-32. Subsequently, in Hampton v. United States, 425 U.S. 484 (1976), a three-justice plurality of the Court stated that, absent entrapment, due process could never be offended by over-involvement of government agents in criminal offenses. The concurring and dissenting justices instead left open the possibility of a due process challenge under Russell.
 
 
 18
 Since the Supreme Court's pronouncements in Russell and Hampton, we have had occasion to develop and expound upon the "outrageous governmental conduct" defense. The criteria utilized by the Sixth Circuit in evaluating the defense was set forth in United States v. Brown, 635 F.2d 1207 (6th Cir.1980), and more recently the standards to apply were articulated in United States v. Norton, 700 F.2d 1072 (6th Cir.), cert. denied, 461 U.S. 910 (1983):
 
 
 19
 (1) The need for the conduct as shown by the type of criminal activity involved; (2) whether the criminal enterprise preexisted the police involvement; (3) whether the government agent directs or controls the enterprise; and (4) the impact of the police activity on the commission of the crime.
 
 
 20
 Id. at 1075.
 
 
 21
 Police flexibility in dealing with contraband offenses is the principal emphasis.
 
 
 22
 In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or "shocking to the universal sense of justice."
 
 
 23
 United States v. Russell, 411 U.S. at 432.
 
 
 24
 In Hampton, Justice Powell, in his concurrence, noted:
 
 
 25
 Police over-involvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement.
 
 
 26
 425 U.S. at 495 n. 7.
 
 
 27
 The defendants focus their attack upon the agents' decision to go forward with the marijuana transport despite the fact that Quintero, the acknowledged target of the operation, no longer required its success as a prerequisite to his involvement with Camelback. But for the importation of the marijuana, the defendants would not ultimately have been arrested. The defendants point to the $60,000 bribe paid to Colombian officials, the $69,000 in traffickers' funds distributed to Davis without benefit of a forfeiture hearing, and the approximately 5,000 pounds of marijuana which escaped the agents' net and thus presumably entered the drug market.
 
 
 28
 The defendants further point to the extensive involvement of and payments to Davis who, they contend, aggravated the improprieties of the agents' conduct. Further, defendant Tranchida argues that the importation of the marijuana through governmental action was in violation of 21 U.S.C. Secs. 952, 957, and 958 and 21 C.F.R. Sec. 1301.26.
 
 
 29
 Even if we assume that the government agents in this case exercised poor judgment, "[o]ur guardianship of constitutional principles ... is not measured by personal distaste." United States v. Leja, 563 F.2d 244, 246 (6th Cir.1977), cert. denied, 434 U.S. 1074 (1978). The decision to go forward with the marijuana transport was made without the benefit of hindsight, and at the time was arguably necessary to establish the legitimacy of the Camelback operation. We agree with the district court that this action does not, in our view, rise to the level of a violation of the defendants' due process rights. The same may be said of the $60,000 bribe. At the time, Von Briessen felt it necessary to the continuation of the undercover activities. As noted in Brown, undercover agents and informants may be required upon occasion to engage in some aspect of criminal activity or to provide something of value to the enterprise as a part of their "cover", and as a means to achieve a desirable and effective end of uncovering illegal drug conduct.
 
 
 30
 The failure to clear the $69,000 of traffickers' funds through a forfeiture proceeding prior to giving it to Davis was poor judgment in our opinion. This conduct, however, was "only collateral to the actual conspiracy; the violation was unconnected to the acts which the defendants are charged with in this case" and thus "was not so intertwined with the conspiracy or so outrageous as to violate due process." United States v. Robinson, 763 F.2d 778, 785 (6th Cir.1985).
 
 
 31
 "[T]he use of paid informants to infiltrate criminal enterprises is a 'recognized and permissible means of investigation.' " Brown, 635 F.2d at 1212 (citing Russell, 411 U.S. at 432). We stated that "[t]he informant or government agent must be allowed to further the interest of the criminal enterprise in some manner to gain the confidence of the criminal elements with which he must deal." 635 F.2d at 1213. In United States v. Bowling, 666 F.2d 1052 (6th Cir.1981), cert. denied, 455 U.S. 960 (1982), a paid informant infiltrated a burglary ring, even going so far as to suggest homes suitable for burglarizing. The informant participated in the burglaries although he did not organize them nor choose specific locations. The court in Bowling refused to accept the defendant's due process challenge, noting that the activities "in no way increased the number of burglaries, or the likelihood of their success." 666 F.2d at 1055.
 
 
 32
 Defendants here were not "entrapped" by Davis. Rather, they came into contact with Davis through Boquette and others. In addition, it was Von Briessen who made the decision to go ahead with the marijuana importation, not Davis. Davis testified that he did not expect the DEA to allow him to keep proceeds from marijuana sales. Finally, as the government points out, the amount of Davis's compensation is more appropriately addressed in defendants' attack on his credibility while on the witness stand. United States v. Jones, 575 F.2d 81, 86 (6th Cir.1978).
 
 
 33
 The defendant Tranchida's argument based upon the agents' alleged violation of 21 U.S.C. Secs. 952, 957 and 958 is refuted by United States v. Lue, 498 F.2d 531 (9th Cir.), cert. denied, 419 U.S. 1031 (1974), and United States v. Arias-Diaz, 497 F.2d 165 (5th Cir.1974), cert. denied, 420 U.S. 1003 (1975), where it was held that the government's providing of importation services merely facilitated the meeting of minds already disposed to criminal conduct and did not constitute outrageous conduct. Even if we concluded that the agents may have violated the statutory sections to which Tranchida cites, as previously indicated, some criminal activity may be necessary in undercover work, particularly in drug cases, and this particular activity, standing alone, is insufficient to hold a due process violation has occurred. The possible "loss" of a large quantity of marijuana was again an unfortunate circumstance. Activities of the agents involved might well prevent a much greater quantity of marijuana from making its way into communities involved.
 
 
 34
 The defendants contend that because they had no direct connection with Hernandez or Ramirez in Colombia, there was no preexisting criminal enterprise involving them. The marijuana was procured with trafficker funds from a source in Colombia, who had a sales representative, Boquette, in the United States. He, in turn, brought in Faxas and Tranchida and they brought in Pelkington. None of these people were identified beforehand by the DEA. All the players in this drama may not have been acting in concert when the government stepped onto the stage, but Hernandez, Ramirez and Boquette previously had been in operation and there was evidence of an interrelationship between the Michigan participants. The DEA agents merely acted as a conduit to bring the source and the distributors of the contraband together.
 
 
 35
 The defendants contend that Von Briessen and Davis orchestrated and controlled the entire series of events leading to their arrests. They liken this situation to United States v. Twigg, 588 F.2d 373 (3d Cir.1978), which involved the illegal manufacture of a controlled substance which was instigated and completely facilitated by the government. Twigg's conviction was held to be tainted by the conduct of the DEA agents; fundamental fairness required its reversal.
 
 
 36
 We are persuaded that the facts in Twigg are distinguishable from those of the present case. Twigg involved the manufacture of drugs rather than the sale of drugs, an important distinction in respect to the amount of governmental involvement in Hampton. More governmental involvement is justified in seeking to locate sellers and distributors of drugs rather than drug manufacturers due to the more transitory and fleeting nature of the crime. In Twigg, the DEA's informant specifically located the defendant and given both supplies and location by DEA, he engaged that defendant in the manufacture of drugs.
 
 
 37
 In the present case, at least initially, the marijuana importation was directed by Hernandez. Boquette located purchasers, and Faxas directed the distribution of the marijuana. Von Briessen and Davis merely played their intermediary roles within the bounds set by Russell.
 
 
 38
 In sum, the defendants argue that but for the government's activities, they would not have been arrested. This is but another way of presenting an entrapment defense. Defendants' briefs are replete with protestations that the "innocent" defendants were lured into their crimes by Von Briessen and Davis. Defendants, however, have not appealed their convictions on the basis of entrapment, choosing instead an "outrageous conduct" defense. They have thus implicitly acknowledged their predisposition towards the crimes for which they were convicted. The role of the DEA in providing the contraband merely furnished the means for defendants to carry out a predisposition towards profitable sale and distribution of marijuana and in all likelihood, other drugs. We find no reversible error after consideration of all the arguments made by defendants.
 
 
 39
 The district court did not abuse its discretion in denying the defendants' motions to dismiss. We therefore AFFIRM the convictions.