983 F.2d 1069
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Darius W. HOBER, Defendant-Appellant.
 No. 92-5204.
 United States Court of Appeals, Sixth Circuit.
 Jan. 20, 1993.
 
 Before NATHANIEL R. JONES and RYAN, Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Darius W. Hober appeals from his conviction for possession of morphine with the intent to distribute and possession of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 844(a). He presents the following issues on appeal:
 
 
 2
 1. Whether sufficient evidence of predisposition was introduced so that a rational jury could conclude, beyond a reasonable doubt, that Hober was not entrapped.
 
 
 3
 2. Whether the district court erred in denying Hober's motion for acquittal or a directed verdict based on his claim that the government's outrageous conduct in its investigation violated Hober's constitutional right to due process.
 
 
 4
 3. Whether the death of the government's informant before trial deprived Hober of his Sixth Amendment right to confront witnesses against him.
 
 
 5
 We conclude that the district court's determination of these issues was correct, and we shall affirm.
 
 I.
 
 6
 The government's case against Darius Hober was built from drug transactions consummated between Hober and undercover DEA agents in meetings facilitated by an informant, Anna Christie. Christie was an ex-nurse who had lost her license because of repeated drug offenses. She died of drug abuse-related ailments before trial.
 
 A.
 
 7
 Anna Christie was arrested by Detective Pat Sowers of the Jefferson County, Kentucky, Police Department on September 5, 1989. She was charged with fraudulently obtaining prescription drugs from the Brown Cancer Center in Louisville. Although Detective Sowers was apparently unaware, Christie had previously been arrested in Jefferson County for fraudulently obtaining prescription drugs. She also had drug charges pending in Pulaski County Circuit Court and Adair County Circuit Court. Detective Sowers was aware of these charges, knew that Christie had lost her nurse's license, and knew that she was a drug addict.
 
 
 8
 Christie had previously worked as an undercover informant for the Lexington Police Department, and for Adair County police. While serving as an informant for these agencies, she continued to illegally obtain drugs, use drugs, and even stole mug shot photos of herself from an officer with whom she was working.
 
 
 9
 Christie was indicted on the Brown Cancer Center charges in February of 1991. Prior to this time, in December 1990, Detective Sowers had suggested to the DEA the possibility of Christie serving as a federal undercover informant. On December 18, 1990, Christie and DEA Special Agent Ray Price spoke about Christie working as a government informant.
 
 
 10
 At her December 18 meeting with Agent Price, Christie told Price that her friend, Darius Hober, had stolen prescription drugs at his workplace, the University of Kentucky Hospital Pharmacy, and that he wanted to sell them. Agent Price decided to use Christie as an informant. Agent Price, like Detective Sowers, knew Christie was an addict, and that she was facing drug charges in Louisville. Both he and Detective Sowers encouraged Christie to remain drug-free, and to obey the law while she worked for the government.
 
 B.
 
 11
 On December 18, 1990, the DEA agents decided to have Christie contact Hober from their office and arrange a morphine purchase for the next day. Christie called Hober and told him that a friend, Linda, and Linda's boyfriend wanted to buy morphine the next day, in Louisville. She told Hober that her friends would pay $1000 for the morphine. They arranged to meet at a tavern. The conversation was recorded by DEA agents.
 
 
 12
 Hober's version of the events differs sharply from the government's. Hober contends that Christie was romantically and sexually involved with him. He also argues that Christie had pleaded with him on several occasions to provide drugs to a friend who was a terminal cancer patient, unable to obtain medication. Hober testified that he eventually gave in to Christie and agreed to provide her friend with morphine, primarily as a favor to Christie.
 
 
 13
 On December 19, 1990, Hober, who was accompanied by Christie, drove to the pre-arranged meeting place. Agent Raffa, a female DEA agent posing as "Linda," and Agent Price, posing as Linda's boyfriend, arrived in another car. Christie introduced Hober to her "friends." Agent Raffa and Christie went inside the tavern while Hober and Agent Price met inside Christie's car. Hober gave Agent Price a morphine vial in exchange for $1000. Hober counted the money and also agreed to supply morphine on subsequent occasions. This transaction was recorded on audio and video tape by the DEA. Subsequent analysis of the liquid in the vial revealed that it contained only 5% morphine.
 
 C.
 
 14
 On December 20, 1990, Christie had a court appearance in Jefferson County Court in Louisville on her pending drug charges. She was accompanied by Detective Sowers and Agent Marcia Jones of the DEA. Agent Jones told the Jefferson County judge that Christie had begun to work for the DEA two days earlier. She also confirmed that the DEA had paid Christie $100 for her role in helping to set up the December 19 transaction, and that Christie had received $25 to reimburse her for travel expenses. Christie's case was continued.
 
 D.
 
 15
 When Agent Price learned that the morphine from the December 19 transaction was only 5% pure, he contacted Hober at the pharmacy by telephone, pretending to be disgruntled. Hober offered to make it up to Agent Price, and they agreed to meet the following day.
 
 
 16
 At 11:00 a.m. on January 4, 1990, Hober and Price met at a tavern in Louisville. Hober gave Price two morphine vials for $1000. Hober also produced a half-filled vial that he proposed to sell to Agent Price for $200 on behalf of a friend. This entire transaction, like the first, was monitored by other law enforcement officers. It was videotaped, and also recorded via a body wire worn by Agent Price.
 
 
 17
 The three vials were later analyzed. One of the vials contained pure morphine, the other was only 3% morphine. The half-filled vial contained no trace of morphine.
 
 E.
 
 18
 When Agent Price was informed of the poor quality of the morphine purchased on January 4, he again telephoned Hober and complained. Later, Agent Price telephoned Hober and asked him to provide two vials of morphine. Agent Price telephoned Hober a third time to confirm the details of a planned new transaction. When Hober said he was not sure his car would make it from Lexington to Louisville, Agent Price offered him an additional $25 to make the trip.
 
 
 19
 The men met the next morning at a store in Louisville. They went outside and got into Price's undercover car. Hober produced one vial and gave it to Price. This vial later proved to contain pure morphine. Price had no money to pay for this last vial, but told Hober that he had a pound of marijuana in the trunk. He asked Hober if he would be interested in selling the marijuana. Hober replied that it "depended on the price." As Hober and Price went to the rear of the car, the supporting officers moved in and arrested Hober. This transaction was observed by other officers, but the audio recording of the transaction was of poor quality. A search of Hober's vehicle yielded a small amount of marijuana and a marijuana pipe.
 
 F.
 
 20
 Hober was arrested, advised of his rights, and taken into custody by DEA agents. In a statement given following his arrest, Hober admitted taking and selling morphine from the pharmacy because of "financial pressures," and because he had "access [to the drugs] with no security." He gave the DEA written permission to search his apartment, where agents found a small amount of marijuana. Hober was indicted on three counts of possession of morphine with the intent to distribute, and one count of possession of marijuana.
 
 G.
 
 21
 The defense, largely through Hober's testimony and vigorous cross-examination of government witnesses, attacked Christie's character for truthfulness. The trial transcript reveals that defense counsel was quite successful in doing so. The defense made it abundantly clear that Anna Christie was far from perfect: she was shown to have lied about a prior arrest to Detective Sowers and to have lied to Agent Settles about how long she had known Hober. The defense also revealed her drug addiction, her past relationship with Hober, and her drug abuse-related death.
 
 II.
 A.
 
 22
 Hober contends that the government entrapped him. He argues that without Christie's "coercive and persuasive influence," he would not have sold the vials of morphine to DEA agents. He argues that the government failed to show, beyond a reasonable doubt, that he was predisposed to deal morphine. Hober relies on Sorrells v. United States, 287 U.S. 435, 441 (1932), and Jacobson v. United States, --- U.S. ----; 112 S.Ct. 1535 (1992).
 
 
 23
 We must affirm a jury conviction "if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Bourjaily, 781 F.2d 539, 544 (6th Cir.1986), aff'd, 483 U.S. 171 (1987). When the predisposition element of an entrapment defense is at issue, we may not overturn a jury verdict unless we determine "that no reasonable juror could have concluded beyond a reasonable doubt that the defendant was predisposed to violate the narcotics laws." United States v. McLernon, 746 F.2d 1098, 1111 (6th Cir.1984).
 
 
 24
 Where "officers or employees of the Government merely afford opportunities ... for the commission of the offense," entrapment will not be found. Id. at 1541. "[T]he principal element in the defense of entrapment" focuses upon whether the defendant was an "unwary innocent," rather than an "unwary criminal who readily availed himself of the opportunity to perpetrate the crime." Matthews v. United States, 485 U.S. 58, 63 (1987). The facts from Sorrells and Jacobson aptly demonstrate what makes an entrapped defendant an "unwary innocent."
 
 
 25
 In Sorrells, the defendant was convicted of selling whiskey in violation of the National Prohibition Act. In order to induce the defendant to sell, the undercover officer who purchased the liquor had to make five requests. After refusing to provide whiskey after four requests, the defendant eventually gave in. The Supreme Court overturned the defendant's conviction, noting "that defendant had no previous disposition to commit [the offense] ... but was ... lured ... to its commission by repeated and persistent solicitation." Sorrells, 287 U.S. at 441 (emphasis added).
 
 
 26
 The facts of Jacobson are similar. There, the defendant had been convicted of ordering child pornography in violation of federal law. He appealed the lower courts' determination that he had not been entrapped as a matter of law. The Supreme Court reversed the conviction, noting that Jacobson had been the subject of a two and a-half year sting operation, conducted by two government agencies, involving numerous mailings through five fictitious organizations, several telephone calls, and a bogus pen pal.
 
 
 27
 We have stated that "once in issue, a defendant's predisposition must be proven beyond a reasonable doubt, and we have defined predisposition as 'the defendant's state of mind before his initial exposure to government agents.' " United States v. Clark, 957 F.2d 248, 250 (6th Cir.1992) (quoting United States v. Barger, 931 F.2d 359, 366 (6th Cir.1991)). Predisposition is a question for the jury. Sherman v. United States, 356 U.S. 369, 377 (1958).
 
 
 28
 In this case, the dispositive question is whether Hober was predisposed to deal morphine before Christie's call on December 18. Because of Christie's death, she was unable to confirm in court that Hober had expressed an interest in stealing or selling morphine prior to her first phone call form DEA offices.
 
 
 29
 Christie's testimony came into the trial through DEA Agent Price, as hearsay to which no defense objection was made. Price testified that Christie had told him that Hober was willing to sell morphine. Indeed, the government witnesses testified that this was the very reason the DEA's investigation of Hober was launched.
 
 
 30
 Additionally, Sharon Taulby, a fellow pharmacy technician who was a government witness under a grant of immunity, testified that she had smoked marijuana with Hober, purchased marijuana from him, and sold marijuana to him in the late spring and early summer of 1989.
 
 
 31
 As we have previously stated, "when a defendant raises an entrapment defense, the government is permitted to make a searching inquiry into his predisposition to commit the crime charged." United States v. Hall, 722 F.2d 742, 745 (6th Cir.1983) (citation omitted). The evidence of predisposition introduced by the government was sufficient for a rational jury to conclude, beyond a reasonable doubt, that Hober was predisposed to deal morphine on December 18, 1990. The government's use of Christie and the investigation of Hober leading up to the first morphine sale fall far short of the facts presented by Sorrells and Jacobson.
 
 
 32
 The subsequent transactions in January 1991 present even clearer evidence of predisposition. In advance of these deals, Hober agreed to sell more morphine to Agent Price. Hober also intimated that he might be able to obtain other illicit drugs. He willingly accepted $1000 at the December meeting and bargained with Agent Price about how he could compensate Price for the overly-diluted morphine solutions. Finally, he even showed interest in selling the marijuana Agent Price purportedly had in his car trunk.
 
 B.
 
 33
 Hober next contends that the government's tactics in investigating him were "so outrageous and offensive" that his constitutional right to due process was violated. Hober argues that the government's use of Christie, with whom Hober had previous and perhaps ongoing romantic involvement, who was a drug addict, had lied, and was on the government payroll, was outrageous. He argues that the district court erred in not granting his motion for acquittal or directed verdict.
 
 
 34
 We review a challenge to the district court's denial of a motion for acquittal or directed verdict under the same standard as the district court.
 
 
 35
 In deciding whether evidence is sufficient to withstand a motion for acquittal, we must view the evidence and all reasonable inferences in the light most favorable to the government. If the evidence is such that we conclude that a reasonable mind might fairly find guilt beyond a reasonable doubt, the issue is one for the jury. If the evidence is such that we conclude that a reasonable doubt is raised, we must reverse a denial of an acquittal motion.
 
 
 36
 United States v. Cordell, 924 F.2d 615, 618 (6th Cir.1991) (quoting United States v. Gibson, 675 F.2d 825, 829 (6th Cir.) (citation omitted), cert. denied, 459 U.S. 972 (1982).
 
 
 37
 A defense based on alleged outrageous conduct by law enforcement officials, in violation of the Fifth and Fourteenth Amendments, is extremely difficult to establish. We have stated that such a defense "would rarely, if ever, be available." United States v. Brown, 635 F.2d 1207, 1212 (6th Cir.1980) (citation omitted). Indeed, this court has denied the defense in cases presenting law enforcement conduct far more startling than the government's use of Christie. See, United States v. Norton, 700 F.2d 1072, 1074-76 (6th Cir.), cert. denied, 461 U.S. 910 (1983); United States v. Barger, 931 F.2d 359, 363 (6th Cir.1991).
 
 
 38
 The Supreme Court has been similarly reticent to find outrageousness. While a plurality of justices has indicated that some police conduct might in theory be so egregious as to violate an accused's due process rights, Hampton v. United States, 425 U.S. 484, 495 (1976), the Court has never actually made such a determination in a case before it.
 
 
 39
 The government's conduct in its investigation of Darius Hober was not flawless. Certainly, it would have been preferable to have had an informant who was drug-free, not romantically involved with the defendant, and not facing drug charges. In the final analysis, however, these factors do not constitute outrageous law enforcement conduct. The DEA's use of Christie was not violative of Hober's right to "fundamental fairness" arising from the Due Process Clause of the Fifth Amendment. See Brown, 635 F.2d at 1212.
 
 IV.
 
 40
 We have considered Hober's claim that informant Christie's death prior to trial deprived Hober of his Sixth Amendment right to confront witnesses against him, and conclude that the claim is utterly meritless.
 
 V.
 
 41
 For the foregoing reasons, we AFFIRM Darius Hober's convictions for possession and distribution of morphine and possession of marijuana.